# UNITED STATES *v.* DION

No. 85–246.   Argued March 25, 1986—Decided June 11, 1986

MARSHALL, J., delivered the opinion for a unanimous Court.

*Jeffrey P. Minear* argued the cause *pro hac vice* for the United States. On the briefs were *Solicitor General Fried, Assistant Attorney General Habicht, Deputy Solicitor General Wallace, Harriet S. Shapiro, Donald A. Carr, Claire L. McGuire,* and *James C. Kilbourne.*

*Terry L. Pechota* by appointment of the Court, 474 U. S. 978, argued the cause and filed a brief for respondent.*

JUSTICE MARSHALL delivered the opinion of the Court.

Respondent Dwight Dion, Sr., a member of the Yankton Sioux Tribe, was convicted of shooting four bald eagles on the Yankton Sioux Reservation in South Dakota in violation of the Endangered Species Act, 87 Stat. 884, as amended, 16 U. S. C. § 1531 *et seq.* (1982 ed. and Supp. II).[1] The District Court dismissed before trial a charge of shooting a golden eagle in violation of the Bald Eagle Protection Act, 54 Stat. 250, 16 U. S. C. § 668 *et seq.* (Eagle Protection Act). Dion was also convicted of selling carcasses and parts of eagles and other birds in violation of the Eagle Protection Act and the Migratory Bird Treaty Act, 40 Stat. 755, as amended, 16 U. S. C. § 703 *et seq.* The Court of Appeals for the Eighth Circuit affirmed all of Dion's convictions except those for

---

*Briefs of *amici curiae* urging reversal were filed for the Environmental Defense Fund, Inc., et al. by *Michael J. Bean;* and for the International Association of Fish and Wildlife Agencies by *Paul A. Lenzini.*

Briefs of *amici curiae* urging affirmance were filed for the Assiniboine and Sioux Tribes of the Fort Peck Reservation et al. by *Harry R. Sachse* and *Arthur Lazarus, Jr.;* for the Hopi Indian Tribe by *Michael P. O'Connell;* for the National Congress of American Indians et al. by *Henry J. Sockbeson* and *Steven C. Moore;* and for the Seminole Indian Tribe of Florida by *Charles A. Hobbs* and *Jerry C. Straus.*

[1] The jury verdict at trial did not conclusively establish that Dion is a member of the Tribe or that the killings took place on the reservation. See 752 F. 2d 1261, 1270 (1985) (indicating that those questions remain open for determination on remand). Both parties, however, agree in this Court that Dion is a member of the Yankton Sioux Tribe. Brief for United States 10; Brief for Respondent 2. Dion testified at trial that the birds were all killed on the reservation, the Eighth Circuit assumed that fact for the purposes of its opinion, and we shall do the same.

shooting bald eagles in violation of the Endangered Species Act. 752 F. 2d 1261, 1270 (1985) (en banc); 762 F. 2d 674, 694 (1985) (panel opinion). As to those, it stated that Dion could be convicted only upon a jury determination that the birds were killed for commercial purposes. 752 F. 2d, at 1270. It also affirmed the District Court's dismissal of the charge of shooting a golden eagle in violation of the Eagle Protection Act. *Ibid.* We granted certiorari, 474 U. S. 900 (1985), and we now reverse the judgment of the Court of Appeals insofar as it reversed Dion's convictions under the Endangered Species Act and affirmed the dismissal of the charge against him under the Eagle Protection Act.

## I

The Eagle Protection Act by its terms prohibits the hunting of the bald or golden eagle anywhere within the United States, except pursuant to a permit issued by the Secretary of the Interior. The Endangered Species Act imposes an equally stringent ban on the hunting of the bald eagle. The Court of Appeals for the Eighth Circuit, however, sitting en banc, held that members of the Yankton Sioux Tribe have a treaty right to hunt bald and golden eagles within the Yankton Reservation for noncommercial purposes.[2] It further held that the Eagle Protection Act and Endangered Species Act did not abrogate this treaty right. It therefore directed that Dion's convictions for shooting bald eagles be vacated, since neither the District Court nor the jury made any explicit finding whether the killings were for commercial or noncommercial purposes.[3]

---

[2] The court held that tribal members have no treaty right to sell eagles, or to hunt eagles for commercial purposes. 752 F. 2d, at 1264–1265. Dion does not challenge that holding here, and its validity is not before us.

[3] On remand from the en banc court, an Eighth Circuit panel rejected a religious freedom claim raised by Dion. Dion does not pursue that claim here, and accordingly we do not consider it.

A statement made by the panel in rejecting that claim, though, casts some doubt on whether the issue of whether Dion had a treaty right to kill

The Court of Appeals relied on an 1858 treaty signed by the United States and by representatives of the Yankton Tribe. Treaty with the Yancton (1858 spelling) Sioux, Apr. 19, 1858, 11 Stat. 743. Under that treaty, the Yankton ceded to the United States all but 400,000 acres of the land then held by the Tribe. The treaty bound the Yanktons to remove to, and settle on, their reserved land within one year. The United States in turn agreed to guarantee the Yanktons quiet and undisturbed possession of their reserved land, and to pay to the Yanktons, or expend for their benefit, various moneys in the years to come. The area thus reserved for the Tribe was a legally constituted Indian reservation, see *Minnesota* v. *Hitchcock*, 185 U. S. 373, 389–390 (1902); *Wood* v. *Jameson*, 130 N. W. 2d 95 (S. D. 1964). The treaty did not place any restriction on the Yanktons' hunting rights on their reserved land.

All parties to this litigation agree that the treaty rights reserved by the Yankton included the exclusive right to hunt and fish on their land. See Brief for United States 19; Brief

eagles for noncommercial purposes is squarely before us. The panel stated: "The record reveals that Dion, Sr. was killing eagles and other protected birds for commercial gain . . . ." 762 F. 2d 674, 680 (1985). Notwithstanding its statement that Dion's killings were for commercial gain, apparently inconsistent with the en banc court's refusal to pass on that issue, it issued a judgment vacating Dion's convictions for shooting bald eagles "pursuant to the opinion of this Court *en banc.*" *Id.*, at 694.

We find that this case properly presents the issue whether killing eagles for noncommercial purposes is outside the scope of the Eagle Protection Act and the Endangered Species Act. The Eighth Circuit panel did not disturb the en banc court's holding that Dion cannot be convicted absent a jury determination of whether the killings were for a commercial purpose, and vacated his convictions for shooting bald eagles because the jury made no such finding. The Solicitor General argues that Dion's convictions should have been affirmed whether the killings were for commercial or noncommercial purposes. The correctness of the holding below that killing for noncommercial purposes is not punishable, therefore, is squarely before us.

for Respondent 7.[4]   As a general rule, Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them, unless such rights were clearly relinquished by treaty or have been modified by Congress.   F. Cohen, Handbook of Federal Indian Law 449 (1982) (hereinafter Cohen).   These rights need not be expressly mentioned in the treaty.   See *Menominee Tribe* v. *United States*, 391 U. S. 404 (1968); *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78 (1918).   Those treaty rights, however, little avail Dion if, as the Solicitor General argues, they were subsequently abrogated by Congress.   We find that they were.[5]

## II

It is long settled that "the provisions of an act of Congress, passed in the exercise of its constitutional authority, . . . if clear and explicit, must be upheld by the courts, even in contravention of express stipulations in an earlier treaty" with a foreign power.   *Fong Yue Ting* v. *United States*, 149 U. S. 698, 720 (1893); cf. *Goldwater* v. *Carter*, 444 U. S. 996 (1979).   This Court applied that rule to congressional abrogation of Indian treaties in *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 566 (1903).   Congress, the Court concluded, has the power "to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so."   *Ibid.*

We have required that Congress' intention to abrogate Indian treaty rights be clear and plain.   Cohen 223; see also

---

[4] Such treaty rights can be asserted by Dion as an individual member of the Tribe.   See *United States* v. *Winans*, 198 U. S. 371, 381 (1905); *Kimball* v. *Callahan*, 590 F. 2d 768, 773 (CA9), cert. denied, 444 U. S. 826 (1979); see also *United States* v. *Felter*, 752 F. 2d 1505, 1509 (CA10 1985).

[5] We therefore do not address the Solicitor General's argument that Dion's hunting is outside the scope of the treaty right because that right does not protect hunting "to extinction."

*United States* v. *Santa Fe Pacific R. Co.*, 314 U. S. 339, 353 (1941). "Absent explicit statutory language, we have been extremely reluctant to find congressional abrogation of treaty rights . . . ." *Washington* v. *Washington Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 690 (1979). We do not construe statutes as abrogating treaty rights in "a backhanded way," *Menominee Tribe* v. *United States*, 391 U. S., at 412; in the absence of explicit statement, "'the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress.'" *Id.*, at 413, quoting *Pigeon River Co.* v. *Cox Co.*, 291 U. S. 138, 160 (1934). Indian treaty rights are too fundamental to be easily cast aside.[6]

We have enunciated, however, different standards over the years for determining how such a clear and plain intent must be demonstrated. In some cases, we have required that Congress make "express declaration" of its intent to abrogate treaty rights. See *Leavenworth, L., & G. R. Co.* v. *United States*, 92 U. S. 733, 741–742 (1876); see also Wilkinson & Volkman 627–630, 645–659. In other cases, we have looked to the statute's "'legislative history'" and "'surrounding circumstances'" as well as to "'the face of the Act.'" *Rosebud Sioux Tribe* v. *Kneip*, 430 U. S. 584, 587 (1977), quoting *Mattz* v. *Arnett*, 412 U. S. 481, 505 (1973). Explicit statement by Congress is preferable for the purpose of ensuring legislative accountability for the abrogation of treaty rights, cf. *Seminole Nation* v. *United States*, 316 U. S. 286, 296–297 (1942). We have not rigidly interpreted that preference, however, as a *per se* rule; where the evidence of congressional intent to abrogate is sufficiently compelling, "the weight of authority indicates that such an intent can also be found by a reviewing court from clear and reliable evidence in the legislative history of a statute." Cohen 223. What is

---

[6] See also Wilkinson & Volkman, Judicial Review of Indian Treaty Abrogation: "As Long as Water Flows, or Grass Grows Upon the Earth"—How Long a Time Is That?, 63 Calif. L. Rev. 601 (1975) (hereinafter Wilkinson & Volkman).

essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.

## A

The Eagle Protection Act renders it a federal crime to "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner any bald eagle commonly known as the American eagle or any golden eagle, alive or dead, or any part, nest, or egg thereof." 16 U. S. C. § 668(a). The prohibition is "sweepingly framed"; the enumeration of forbidden acts is "exhaustive and careful." *Andrus* v. *Allard*, 444 U. S. 51, 56 (1979). The Act, however, authorizes the Secretary of the Interior to permit the taking, possession, and transportation of eagles "for the religious purposes of Indian tribes," and for certain other narrow purposes, upon a determination that such taking, possession, or transportation is compatible with the preservation of the bald eagle or the golden eagle. 16 U. S. C. § 668a.

Congressional intent to abrogate Indian treaty rights to hunt bald and golden eagles is certainly strongly suggested on the face of the Eagle Protection Act. The provision allowing taking of eagles under permit for the religious purposes of Indian tribes is difficult to explain except as a reflection of an understanding that the statute otherwise bans the taking of eagles by Indians, a recognition that such a prohibition would cause hardship for the Indians, and a decision that that problem should be solved not by exempting Indians from the coverage of the statute, but by authorizing the Secretary to issue permits to Indians where appropriate.

The legislative history of the statute supports that view. The Eagle Protection Act was originally passed in 1940, and did not contain any explicit reference to Indians. Its prohibitions related only to bald eagles; it cast no shadow on hunt-

ing of the more plentiful golden eagle. In 1962, however, Congress considered amendments to the Eagle Protection Act extending its ban to the golden eagle as well. As originally drafted by the staff of the Subcommittee on Fisheries and Wildlife Conservation of the House Committee on Merchant Marine and Fisheries, the amendments simply would have added the words "or any golden eagle" at two places in the Act where prohibitions relating to the bald eagle were described. Miscellaneous Fish and Wildlife Legislation: Hearings before the Subcommittee on Fisheries and Wildlife Conservation of the House Committee on Merchant Marine and Fisheries, 87th Cong., 2d Sess., 1 (1962) (hereinafter House Hearings).

Before the start of hearings on the bill, however, the Subcommittee received a letter from Assistant Secretary of the Interior Frank Briggs on behalf of the Interior Department. The Interior Department supported the proposed bill. It noted, however, the following concern:

> "The golden eagle is important in enabling many Indian tribes, particularly those in the Southwest, to continue ancient customs and ceremonies that are of deep religious or emotional significance to them. We note that the Handbook of American Indians (Smithsonian Institution, 1912) volume I, page 409, states in part, as follows:
>
> "'Among the many birds held in superstitious and appreciative regard by the aborigines of North America, the eagle, by reason of its majestic, solitary, and mysterious nature, became an especial object of worship. This is expressed in the employment of the eagle by the Indian for religious and esthetic purposes only.
>
> .    .    .    .    .
>
> "There are frequent reports of the continued veneration of eagles and of the use of eagle feathers in religious ceremonies of tribal rites. The Hopi, Zuni, and several of the Pueblo groups of Indians in the Southwest have

great interest in and strong feelings concerning eagles. In the circumstances, it is evident that the Indians are deeply interested in the preservation of both the golden and the bald eagle. If enacted, the bill should therefore permit the Secretary of the Interior, by regulation, to allow the use of eagles for religious purposes by Indian tribes." House Hearings 2–3.

The House Committee reported out the bill.[7] In setting out the need for the legislation, it explained in part:

"Certain feathers of the golden eagle are important in religious ceremonies of some Indian tribes and a large number of the birds are killed to obtain these feathers, as well as to provide souvenirs for tourists in the Indian country. In addition, they are actively hunted by bounty hunters in Texas and some other States. As a result of these activities if steps are not taken as contemplated in this legislation, there is grave danger that the golden eagle will completely disappear." H. R. Rep. No. 1450, 87th Cong., 2d Sess., 2 (1962).

The Committee also reprinted Assistant Secretary Briggs' letter in its Report, *id.*, at 3–5, and adopted an exception for Indian religious use drafted by the Interior Department. The bill as reported out of the House Committee thus made three major changes in the law, along with other more technical ones. It extended the law's ban to golden eagles. It provided that the Secretary may exempt, by permit, takings of bald or golden eagles "for the religious purposes of Indian tribes." And it added a final proviso: "Provided, That bald eagles may not be taken for any purpose unless, prior to such taking, a permit to do so is procured from the Secretary of the Interior." *Id.*, at 7. The bill, as amended, passed the

---

[7] Various witnesses, during the course of the Subcommittee hearings, gave testimony relating to the effect of the proposed ban on Indian tribes. See House Hearings 15, 20, 29, 34, 35, 39, 47.

House and was reported to the Senate Committee on Commerce.

At the Senate hearings, representatives of the Interior Department reiterated their position that, because "the golden eagle is an important part of the ceremonies and religion of many Indian tribes," the Secretary should be authorized to allow the use of eagles for religious purposes by Indian tribes. Protection for the Golden Eagle: Hearings before a Subcommittee of the Senate Committee on Commerce, 87th Cong., 2d Sess., 23 (1962). The Senate Committee agreed, and passed the House bill with an additional amendment allowing the Secretary to authorize permits for the taking of golden eagles that were preying on livestock. That Committee again reprinted Assistant Secretary Briggs' letter, S. Rep. No. 1986, 87th Cong., 2d Sess., 5–7 (1962), and summarized the bill as follows: "The resolution as hereby reported would bring the golden eagle under the 1940 act, allow their taking under permit for the religious use of the various Indian tribes (their feathers are an important part of Indian religious rituals) and upon request of a Governor of any State, be taken for the protection of livestock and game." *Id.*, at 3–4. The bill passed the Senate, and was concurred in by the House, with little further discussion.

It seems plain to us, upon reading the legislative history as a whole, that Congress in 1962 believed that it was abrogating the rights of Indians to take eagles. Indeed, the House Report cited the demand for eagle feathers for Indian religious ceremonies as one of the threats to the continued survival of the golden eagle that necessitated passage of the bill. See *supra*, at 742. Congress expressly chose to set in place a regime in which the Secretary of the Interior had control over Indian hunting, rather than one in which Indian on-reservation hunting was unrestricted. Congress thus considered the special cultural and religious interests of Indians, balanced those needs against the conservation purposes of the statute, and provided a specific, narrow ex-

ception that delineated the extent to which Indians would be permitted to hunt the bald and golden eagle.

Respondent argues that the 1962 Congress did not in fact view the Eagle Protection Act as restricting Indian on-reservation hunting. He points to an internal Interior Department memorandum circulated in 1962 stating, with little analysis, that the Eagle Protection Act did not apply within Indian reservations. Memorandum from Assistant Solicitor Vaughn, Branch of Fish and Wildlife, Office of the Solicitor to the Director, Bureau of Sport Fisheries and Wildlife, Apr. 26, 1962. We have no reason to believe that Congress was aware of the contents of the Vaughn memorandum. More importantly, however, we find respondent's contention that the 1962 Congress did not understand the Act to ban all Indian hunting of eagles simply irreconcilable with the statute on its face.

Respondent argues, and the Eighth Circuit agreed, that the provision of the statute granting permit authority is not necessarily inconsistent with an intention that Indians would have unrestricted ability to hunt eagles while on reservations. Respondent construes that provision to allow the Secretary to issue permits to *non*-Indians to hunt eagles "for Indian religious purposes," and supports this interpretation by pointing out testimony during the hearings to the effect that large-scale eagle bounty hunters sometimes sold eagle feathers to Indian tribes. We do not find respondent's argument credible. Congress could have felt such a provision necessary only if it believed that Indians, if left free to hunt eagles on reservations, would nonetheless be unable to satisfy their own needs and would be forced to call on non-Indians to hunt on their behalf. Yet there is nothing in the legislative history that even remotely supports that patronizing and strained view. Indeed, the Interior Department immediately after the passage of the 1962 amendments adopted regulations authorizing permits *only* to "individual Indians who are authen-

tic, bona fide practitioners of such religion." 28 Fed. Reg. 976 (1963).[8]

Congress' 1962 action, we conclude, reflected an unmistakable and explicit legislative policy choice that Indian hunting of the bald or golden eagle, except pursuant to permit, is inconsistent with the need to preserve those species. We therefore read the statute as having abrogated that treaty right.

### B

Dion also asserts a treaty right to take bald eagles as a defense to his Endangered Species Act prosecution. He argues that the evidence that Congress intended to abrogate treaty rights when it passed the Endangered Species Act is considerably more slim than that relating to the Eagle Protection Act. The Endangered Species Act and its legislative history, he points out, are to a great extent silent regarding Indian hunting rights. In this case, however, we need not resolve the question of whether the Congress in the Endangered Species Act abrogated Indian treaty rights. We conclude that Dion's asserted treaty defense is barred in any event.

Dion asserts that he is immune from Endangered Species Act prosecution because he possesses a treaty right to hunt and kill bald eagles. We have held, however, that Congress in passing and amending the Eagle Protection Act divested Dion of his treaty right to hunt bald eagles. He therefore has no treaty right to hunt bald eagles that he can assert as a defense to an Endangered Species Act charge.

We do not hold that when Congress passed and amended the Eagle Protection Act, it stripped away Indian treaty protection for conduct not expressly prohibited by that statute.

---

[8] Respondent's argument that Congress in amending the Eagle Protection Act meant to benefit nontreaty tribes is also flawed. Indian reservations created by statute, agreement, or executive order normally carry with them the same implicit hunting rights as those created by treaty. See Cohen 224; *Antoine* v. *Washington*, 420 U. S. 194 (1975).

But the Eagle Protection Act and the Endangered Species Act, in relevant part, prohibit exactly the same conduct, and for the same reasons. Dion here asserts a treaty right to engage in precisely the conduct that Congress, overriding Indian treaty rights, made criminal in the Eagle Protection Act. Dion's treaty shield for that conduct, we hold, was removed by that statute, and Congress' failure to discuss that shield in the context of the Endangered Species Act did not revive that treaty right.

It would not promote sensible law to hold that while Dion possesses no rights derived from the 1858 treaty that bar his prosecution under the Eagle Protection Act for killing bald eagles, he nonetheless possesses a right to hunt bald eagles, derived from that same treaty, that bars his Endangered Species Act prosecution for the same conduct. Even if Congress did not address Indian treaty rights in the Endangered Species Act sufficiently expressly to effect a valid abrogation, therefore, respondent can assert no treaty defense to a prosecution under that Act for a taking already explicitly prohibited under the Eagle Protection Act.

## III

We hold that the Court of Appeals erred in recognizing Dion's treaty defense to his Eagle Protection Act and Endangered Species Act prosecutions. For the reasons stated in n. 3, *supra*, we do not pass on the claim raised by *amici* that the Eagle Protection Act, if read to abrogate Indian treaty rights, invades religious freedom. Cf. *United States* v. *Abeyta*, 632 F. Supp. 1301 (NM 1986). Nor do we address respondent's argument, raised for the first time in this Court, that the statutes under which he was convicted do not authorize separate convictions for taking and for selling the same birds. The judgment of the Court of Appeals is reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*