UNITED STATES of America, Plaintiff,

v.

Walter A. BRESETTE, and Esther Nahgahnub, Defendants.

Crim. No. 5–90–7(1 & 2).

United States District Court,
D. Minnesota,
Third Division.

April 9, 1991.

Jeanne J. Graham, Asst. U.S. Atty., Minneapolis, Minn., for plaintiff.

Jerod H. Peterson, Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter is before the court upon defendants' motion to dismiss following the trial of the matter to the court. For the reasons set forth below, defendants' motion is GRANTED.

### FACTS

This is a prosecution for sale of migratory bird feathers pursuant to the Migratory Bird Treaty Act, 16 U.S.C. §§ 703–712. More specifically, the case arises out of the sale of various items known as "dream catchers" at defendant Walter A. Bresette's store at the Miller Hill Mall in Duluth, Minnesota. At issue in this motion is whether defendants have the right to sell these items as members of the Chippewa tribe.

The facts which were elicited at trial are not in dispute. Because the case involves Indian treaty rights, the court will discuss in some detail the background of the parties. Defendant Walter A. Bresette is an enrolled member of the Red Cliff Band of the Lake Superior Chippewa Indians. He lives near Bayfield, Wisconsin on the Red Cliff Reservation where he operates a store known as the Buffalo Bay Trading Company. The Buffalo Bay Trading Company sells handcrafted items made by Chippewa and other Native Americans. The Miller Hill Mall store is Bresette's second Buffalo Bay Trading Company store. Esther Nahgahnub is an enrolled member of the Fond Du Lac Band of Lake Superior Chippewa who lives on the Fond Du Lac Reservation near Duluth.

The "dream catchers" at issue here are traditional Chippewa objects of artistic and spiritual value made of materials which include bird feathers. The Chippewa refer to the items as dream catchers because they are intended to be suspended over their beds or the beds of their children in the belief that the dream catchers will protect the sleepers from bad dreams which would otherwise enter them in their defenseless sleep. Dreams have great spiritual significance for the Chippewa. Feathers are incorporated into the dream catchers because birds also have great spiritual significance for the Chippewa, reminding them of the eagle, which they regard as the bridge from the material world to the spiritual world.

On December 16, 1989, a special agent for the United States Department of the Interior entered the Buffalo Bay store in Duluth and noted the presence of migratory bird feathers on the dream catchers. On December 18, a Minnesota Department of Natural Resources agent purchased a dream catcher from the store. The federal agent returned the next day and confronted Bresette, claiming that the dream catchers were illegal to sell based on the presence of migratory bird feathers. Esther Nahgahnub then told the federal agent that she had made some of the dream catchers in the store from owl feathers she had gathered off of road kill and from redtailed hawk feathers which she had acquired from a friend's molting bird. The federal agent seized five of the dream catchers and subsequently received a sixth from the Minnesota DNR agent after he saw news reports of the seizure.

Based on the government's laboratory analysis, the dream catchers contain Canada goose, blue/snow goose, and redtailed hawk feathers. Bresette testified that he received the redtailed hawk feathers from Nahgahnub. Nahgahnub obtained those feathers from land on or near the Fond Du Lac Reservation. Bresette received the other feathers from two women whom he knew were enrolled members of the Red Cliff Band of Lake Superior Chippewa.

### DISCUSSION

Defendants do not dispute that their conduct is proscribed by the Migratory Bird Treaty Act, which provides as follows:

Unless and except as permitted by regulations made as hereinafter provided in

this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import ... any migratory bird, any part, or any product ... of any such bird ... included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds ... the United States and the United Mexican States for the protection of migratory birds ... and the United States and the Government of Japan for the protection of migratory birds[.]

16 U.S.C. § 703. Defendants instead assert an affirmative defense: that they have the right to sell the dream catchers. The motion thus presents one legal question: do defendants have the right, as members of the Chippewa tribe, to sell migratory bird feathers obtained from land ceded by the Chippewa in the treaties of 1842 and 1854? This issue breaks down into three sub-issues: first, whether the Chippewa have a *treaty* right to sell such feathers; second, whether Congress abrogated the treaty right in enacting the Migratory Bird Treaty Act; and third, whether the Migratory Bird Treaty Act's proscription of the sale of migratory bird feathers in this case is a permissible, nondiscriminatory regulation of the Chippewa treaty rights under *Puyallup Tribe v. Department of Game of Washington*, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968). The answers are yes, no, and no.

I.  Usufructuary Rights and the Treaty of 1854

■ Defendants claim that they have the right to hunt, fish and gather the fruits of the land ceded by the Chippewa in 1842 and 1854 from which the feathers were obtained. These rights are known as usufructuary rights—the right to make a modest living by hunting and gathering off the land. The background necessary to define the nature and extent of the Chippewa's treaty rights has been set forth in factual findings and holdings in a series of cases in the Seventh Circuit known as the *Voigt* cases.[1] The cases involve three treaties, the treaties of 1837, 1842, and 1854, in which the Chippewa ceded territory in the Northern Great Lakes region to the federal government. The 1854 treaty covers much of northeastern Minnesota, including the Fond Du Lac reservation. The 1837 and 1842 treaties cover the northeastern third of Wisconsin and portions of the Upper Peninsula of Michigan. The Red Cliff Reservation is within the territory ceded in 1842. *See U.S. v. Bouchard*, 464 F.Supp. 1316, 1364–76 (W.D.Wisc.1978) (appendix). It is not in dispute that both defendants are successors in interest to the Chippewa who entered into these treaties and thus have standing to assert the treaty rights at issue.

The Lake Superior Chippewas settled in the area noted above in the late 1600's and subsisted primarily on hunting, fishing, and harvesting wild rice and maple syrup. With the advent of separate territory status for Wisconsin in 1836 and increased settlement by Europeans, the government sought to buy Indian lands and remove the Indians to lands further west. *Bouchard*, 464 F.Supp. at 1322. The Chippewa agreed to cede territory in the 1837 treaty, but sought to preserve their right to use the land for their traditional subsistence methods. The treaty consequently stated that

---

1.  *See, generally, U.S. v. Bouchard*, 464 F.Supp. 1316 (W.D.Wisc.1978); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341 (7th Cir.1983); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 760 F.2d 177 (7th Cir.1985); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 653 F.Supp. 1420 (W.D.Wisc.1987); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 663 F.Supp. 682 (W.D.Wisc.1987); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 829 F.2d 601 (W.D.Wisc.1987); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 686 F.Supp. 226 (W.D.Wisc.1988); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 707 F.Supp. 1034 (W.D. Wisc.1989). These cases address the nature and extent of the Chippewa usufructuary rights in the territories ceded in 1837 and 1842.

"the privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied [sic] to the Indians, during the pleasure of the president of the United States." *Bouchard*, 464 F.Supp. at 1365. In 1842 the land upon which the Red Cliff Reservation is located, *inter alia*, was ceded in a second treaty because that area was attractive for its mineral deposits, mainly copper. Again the Chippewa sought to maintain their use of the land, with the treaty stating that "the Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States[.]" *Bouchard*, 464 F.Supp. at 1367. In the years following the first two treaties the Chippewa did not move in large numbers to land in Minnesota as the government had hoped. Consequently, in 1850, the President issued a removal order in 1850 ordering the Chippewa to Minnesota. The Chippewa resisted (nonviolently) the order because it contradicted their understanding that they could remain living on ceded territory as long as they conducted themselves peaceably and did not cause trouble with European settlers. *See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 346–47 (7th Cir.1983).

The government then decided to employ a different strategy in light of the Chippewa opposition to removal. A reservation system was the result. The government established reservations (including the Fond Du Lac and Red Cliff) in the treaty of 1854, which also involved the ceding of the northeastern portion of Minnesota. Yet again the Chippewa sought to preserve their right to their hunting and gathering way of life on the land ceded: "Any such of them as reside in the territory hereby ceded, shall have the right to hunt and fish therein, until otherwise ordered by the president." *Bouchard*, 464 F.Supp. at 1373 (quoting the treaty).

Defendants contend that the 1854 and 1842 treaties reserve usufructuary rights *including* the right to take the bird feathers in question and sell them. The government reads the treaties more narrowly, claiming that there is no indication that the Chippewa understood their rights to include the sale of bird feathers. It is axiomatic that Indian treaty rights are to be afforded a broad construction and, indeed, are to be interpreted as the *Indians* understood them because the Indians were generally unlettered and the government had great power over the Indians with a corresponding responsibility toward them. *See, e.g., Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). Applying these well-settled principles, the Seventh Circuit has interpreted the 1837, 1842, and the 1854 treaties as reserving full usufructuary rights for the Chippewa on the ceded territories. *See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 348 (7th Cir.1983). The court finds the Seventh Circuit's interpretation persuasive. The government contends that the 1854 treaty was simply not at issue because the *Voigt* litigants were not concerned with Minnesota land, but this argument ignores the importance of the 1854 treaty to the rationale in *Voigt*. Far from being mere *dicta*, the *Voigt* court's interpretation of the 1854 treaty was part of the rationale in concluding that the 1854 treaty did *not* erase previously existing usufructuary treaty rights in the lands ceded in 1837 and 1842:

> [T]he inclusion in the 1854 treaty of a reservation of usufructuary rights by the Minnesota Chippewas suggests, in our view, that the LCO band believed their usufructuary rights to be secure and unaffected by the treaty.

700 F.2d at 364. *See also Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 760 F.2d 177, 182 (7th Cir.1985). Based on its review of the 1854 treaty and the *Voigt* decisions' factual background regarding the three treaties, the court concludes that the 1854 treaty reserved full usufructuary rights for the Chippewa and additionally concludes, as did the *Voigt* court, that the

Chippewa also reserved full usufructuary rights on the territory ceded in 1842.

That conclusion leaves the nature and extent of the usufructuary rights open to contention. The government interprets the usufructuary rights as *not* including the right to sell the fruit of the land. The court disagrees. Bearing in mind that the treaty rights must be interpreted as the Indians understood them, the three treaties include commercial activity within the reservation of usufructuary rights. As was found in *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 653 F.Supp. 1420, 1424 (W.D. Wisc.1987), the Chippewa were part of the national and international market economy at the time of the treaties:

> The Chippewa in the ceded territory were hunters and gatherers. Their hunting activities included fishing and fowling in addition to traditional notions of hunting. The Chippewa harvested virtually everything on the landscape. They had some use or uses for all the flora and fauna in their environment, whether for food, clothing, shelter, religious, commercial or other purposes. The Chippewa relied on hunting and gathering for their subsistence. They harvested resources for their own immediate, personal use and for use as trade goods in commerce. The Chippewa traded goods for items which contributed to their subsistence. Neither in harvesting resources for commercial purposes nor in harvesting resources for their own use did the Chippewa strive for more than a moderate, satisfactory living. They were indifferent to acquiring wealth beyond their immediate needs.

Included in the species the Chippewa took were "ducks, geese, songbirds, various types of grouse, turkeys, hawks, eagles, owls, and partridges." *LCO III,* 653 F.Supp. at 1427. Further defining the nature of Chippewa commercial activity, the *LCO III* court made the following findings:

> Throughout the nineteenth century, the Chippewa were participants in an international market economy; they were the producers of commodities, primarily furs, and they controlled the resources that flowed into this economy. The exchange of commodities, furs in particular, was a way of life for both the Indians and non-Indians in the nineteenth century.

653 F.Supp. at 1428.

In light of these findings the court cannot agree with the government's parsimonious reading of the treaty rights. The above findings are ample evidence that the Chippewa understood that their hunting and gathering rights, which undeniably include the taking of migratory birds and their feathers, encompassed the sale of their catch. The government insists that there is no evidence regarding the specific trading or selling of bird feathers, but even if such evidence is necessary, defendants have brought it before the court. *See* New York Historical Society, *American Fur Company Papers,* Letter 5508, reel 27 (letter of Charles Borup to William Davenport dated January 23, 1839, discussing the purchase of bird feathers from the Chippewa in Northern Minnesota). Bresette, moreover, has testified that the commercial sale of dream catchers is consistent with Chippewa beliefs.

The above factual findings render the government's legal arguments ineffective. The government's reliance on *United States v. Dion,* 752 F.2d 1261, 1264 (8th Cir.1985), *reversed in part on other grounds,* 476 U.S. 734, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986), and *United States v. Top Sky,* 547 F.2d 486 (9th Cir.1976), is misplaced because in both of these cases there was no historical evidence that the Indians had any history of selling *eagle* parts. But the evidence in those cases was to the contrary—the sale of eagle parts was deplored for religious reasons due to the importance of the eagle. *Top Sky,* 547 F.2d at 487–88; *Dion,* 752 F.2d at 1264. Here there is both direct and circumstantial evidence in defendants' favor and no evidence to the contrary. The court consequently finds that defendants' conduct falls within their treaty rights as Chippewa.

## II. Abrogation

The government next contends that the Migratory Bird Treaty Act abrogated any treaty rights defendants possess.

The Supreme Court most recently clarified the standards for abrogation of treaty rights in *United States v. Dion*, 476 U.S. 734, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986). Congress "has the power 'to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interests of the country and the Indians themselves, that it should be so.'" *Dion*, 476 U.S. at 738, 106 S.Ct. at 2220 (quoting *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903)).

> We have required that Congress's intention to abrogate Indian treaty rights be clear and plain ... Absent explicit statutory language, we have been extremely reluctant to find congressional abrogation of treaty rights ... We do not construe statutes as abrogating treaty rights in a backhanded way ... in the absence of explicit statement, the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress ... Indian treaty rights are too fundamental to be easily cast aside.

*Dion*, 476 U.S. at 739, 106 S.Ct. at 2220 (citations omitted). In analyzing an abrogation question the court looks first and foremost to the face of the statute but may also look to the statute's legislative history and surrounding circumstances. *Id.* "What is essential is clear evidence that Congress *actually considered* the conflict between its intended action on the one hand and Indian treaty rights on the other, and *chose* to resolve that conflict by abrogating the treaty." *Dion*, 476 U.S. at 739–740, 106 S.Ct. at 2220–21 (emphasis added). In *Dion* the court held that the Eagle Protection Act abrogated the Indian treaty right to take bald eagles because the statute clearly reflected Congress's choice and the legislative history bolstered that conclusion. 476 U.S. at 745, 106 S.Ct. at 2223. On its face, the statute allowed Indians to obtain a permit to take eagles for religious purposes. 476 U.S. at 740, 106 S.Ct. at 2221.

In the instant case the statute contains no indication that Congress considered Indian treaty rights and chose to abrogate them. The statute allows "indigenous inhabitants of the State of Alaska to take and collect migratory birds for food and clothing," 16 U.S.C. §§ 704, 712, but this is irrelevant for purposes of *treaty* rights analysis because Native Alaskans do *not* have treaty rights. Federal policy since the acquisition of Alaska has been to make no treaties with Native Alaskans. *See Cohen's Handbook of Federal Indian Law*, 739 (1982). To treat the consideration of indigenous Alaskans' rights as the consideration of Native American *treaty* rights nationwide, for the simple reason that both groups are regarded as Indians, is disingenuous.

That leaves the statute's history. The government points to the consideration of "Eskimo and Indian" practices of taking "auks, auklets, guillemots, murres and puffins and their eggs for food and their skins for clothing ..." in the U.S.–Great Britain (Canada) treaty. The treaty with the Soviet Union also mentions exclusions for "indigenous inhabitants of the State of Alaska." Again, the government's evidence fails to address *treaty* rights. Canada, similarly, suggested that the taking of "scoters" be permitted but this does not indicate *Congressional* consideration of Indian treaty rights in the United States. Canada's concerns about the practices of indigenous Canadians is irrelevant. Finally, the convention with the government of Japan contains exclusions for "Eskimos, Indians, and the indigenous peoples of the Trust Territory of the Pacific Islands for their own food and clothing." This evidence is both unclear and, to say the least, remote in a geographic sense. In brief, the legislative history contains insufficient evidence that treaty rights were specifically considered and eliminated in the creation of the Migratory Bird Treaty Act.[2] Given the

---

**2.** The government relies on *United States v. Billie*, 667 F.Supp. 1485 (S.D.Fla.1987), in which the court considered certain exclusions for in-digenous Alaskans in addressing an abrogation question regarding the application of the Endangered Species Act in Florida, but the *Billie* court

absence of statutory language implicating treaty rights, the court must conclude that Congress did not abrogate defendants' treaty rights in enacting the Migratory Bird Treaty Act.

### III. *Puyallup* Regulation

■ Finally, the government maintains that even if the defendants all have unabrogated treaty rights to sell the migratory bird feathers in question, the Migratory Bird Treaty Act is a permissible nondiscriminatory conservation measure under *Puyallup Tribe v. Department of Game of Washington*, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968). In *Puyallup*, the Supreme Court examined a treaty with the Puyallup and Visqually Indians in Washington which guaranteed them the right to take fish in Washington *"in common"* with all citizens "at all usual and accustomed places." 391 U.S. at 398, 88 S.Ct. at 1728. The court held that Washington could not qualify in its conservation laws the "usual and accustomed places" where the Indians fished but *could* regulate the manner of fishing, the size of the take, and restrict the extent of commercial fishing as long as the conservation measures met appropriate standards and did not discriminate against the Indians. *Id.* This holding causes difficulties when considered with the *Dion* case, *supra,* and does not provide a great deal of guidance for the courts to evaluate the appropriateness of the conservation measures. The government suggests that a statute of general applicability may limit Indian treaty rights under *Puyallup* even if it is not a clear abrogation of those rights as required under *Dion*. In *LCO III*, the court distinguished *Dion* from *Puyallup* because the treaty right in *Dion* was an "exclusive on-reservation hunting right" while the rights asserted in *Puyallup* were not. 653 F.Supp. at 1434–35. *See also LCO II*, 760 F.2d at 183 (some policy restrictions on usufructuary rights might be justified in the interests of avoiding "the extinction of species or even wholesale slaughter or a substantial detriment to the

public safety"); *Billie*, 667 F.Supp. at 1489 (despite *Dion*, Indian treaty rights do not extend to the point of extinction).

The court disagrees with the government's arguments for two reasons. First, *Dion* can be reconciled with *Puyallup*. In *Puyallup*, the court's holding depended on its interpretation of the *treaty itself*. 391 U.S. at 398, 88 S.Ct. at 1728. Because the court interpreted the Indians' fishing rights to be in *common* with other groups, the particular conservation measures did not exceed the Indians' understanding of the treaty. The measures applied to all groups *equally*. The issue of treaty abrogation thus need not be reached. To the extent that the *LCO* and *Billie* courts read *Puyallup* otherwise, the court disagrees. If one reads *Puyallup* as broadly as the government does, one must conclude that *Dion* overruled a portion of the *Puyallup* holding *sub silentio*. Second, and more importantly, even if *Puyallup* stands for the proposition stated in *LCO* and *Billie*, *Puyallup* does not support the conviction of defendants for selling the bird feathers at issue. The government cannot reasonably contend that the statute's absolute proscription of the sale of bird feathers in this manner is a non-discriminatory conservation measure intended to prevent the extinction of migratory birds. The partial restrictions addressed in *Puyallup* were meant to forbid the Indians from "pursu[ing] the last living steelhead until it enters their nets." *Department of Game v. Puyallup Tribe*, 414 U.S. 44, 49, 94 S.Ct. 330, 334, 38 L.Ed.2d 254 (1973). Here the migratory birds of Northern Minnesota and Wisconsin are not faced with extinction due to the likes of Walter Bresette or Esther Nahgahnub. Some regulations and restrictions might be permitted under *Puyallup*, but this prosecution is not.

In sum, defendants have a treaty right to sell these bird feathers which has not been abrogated and is not, under the terms of the Migratory Bird Treaty Act, subject to

---

also noted the inclusion of "Indians" within the Endangered Species Act's definition of "person." *Billie* should not stand for the proposition that

the inclusion of Alaskan natives' concerns in a statute is evidence that Congress has considered Indian treaty rights in the rest of the country.

*Puyallup* limitation. Defendants have prevailed on their affirmative defense.

Accordingly, IT IS ORDERED that this case be DISMISSED.

LET JUDGMENT BE ENTERED ACCORDINGLY.