**UNITED STATES of America,
Plaintiff,**

v.

**David J. GOTCHNIK, Defendant,**

and

**United States of America, Plaintiff,**

v.

**Mark R. Steptec, Defendant.**

**Nos. 98–262 ADM/RLE,
98–302 ADM/RLE.**

United States District Court,
D. Minnesota.

May 28, 1999.

Clifford B. Wardlaw, Assistant United States Attorney, Minneapolis, MN, for plaintiff.

Mark A. Anderson, Jacobson, Buffalo, Schoessler & Magnuson, Ltd., Minneapolis, MN, for defendant.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

### I. INTRODUCTION

The above-entitled matters came on for hearing before the undersigned United

States District Judge pursuant to the Defendants' Motion for the Entry of Judgment of Acquittal. *See* 28 U.S.C. § 636(a)(3); 18 U.S.C. § 3401(a) and (b). For the following reasons, Defendants' motion is granted in part and denied in part.

## II. BACKGROUND

Defendants David J. Gotchnik ("Gotchnik") and Mark F. Steptec ("Steptec") are members of the Bois Forte Band of Chippewa Indians, one of the federally-recognized Indian tribes which were signatories to the Treaty of September 30, 1854, 10 Stat. 11–09 ("the 1854 Treaty"). Under the treaty, the Bois Forte and other Bands ("the Bands") ceded to the United States a portion of the State of Minnesota which included what has become the Boundary Waters Canoe Area Wilderness ("BWCAW") of the Superior National Forest. Article 11 of the Treaty provided that "such of [the Indians] as reside in the territory hereby ceded, shall have the right to hunt and fish therein." The Chippewa have continued to hunt, fish, and gather throughout the ceded territory pursuant to regulations adopted by the Bands. *See Grand Portage Band of Chippewa of Lake Superior, et al. v. State of Minnesota,* Civ. No. 4–85–90, Mem. and Order (D.Minn.1988) (approval of consent decree requiring Bands to regulate hunting, fishing and gathering in the ceded territory).

In July 1998, Gotchnik traveled across Basswood Lake in the BWCAW in a canoe powered by an 8 horsepower motor. *See* Stipulation of Facts at ¶ 1. Such motors are prohibited in the area of Basswood Lake north of Washington Island. *Id.* On his return from this "no motor" area, Gotchnik was observed by Forest Service officers. He identified himself as a member of the Bois Forte Tribe, but was nonetheless cited for violating the federal regulation prohibiting the use of motorized vehicles in portions of the BWCAW. *Id.* at ¶ 3.

In April 1998, Steptec crossed the frozen waters of Basswood Lake on a motorized all-terrain vehicle ("ATV") in order to fish in one of the lake's back bays. *Id.* at ¶ 6. His ATV and fishing equipment—including a motorized ice auger—broke through the ice and fell into the icy water. Steptec notified the authorities; and once the ice conditions permitted boat travel, Steptec and Forest Service officers retrieved the vehicle and the equipment. *Id.* Thereafter, Steptec was cited for illegal use of the motorized vehicle and ice auger within the BWCAW. *Id.* at ¶ 7.

## III. DISCUSSION

Because Steptec's citation for the use of the motorized ice auger presents slightly different issues than the arrests for the use of motorized transportation, the vehicle and equipment violations are addressed separately.

### A. Motorized Vehicle Counts

#### 1. *Affirmative Defenses*

Steptec was charged with "Using motor vehicle in designated wilderness area," in violation of 36 C.F.R. § 261(a). Gotchnik was cited for "Possession and use of outboard motor in federally designated wilderness area," in violation of the same federal regulation. Both Steptec and Gotchnik now argue that, even if the United States has properly proven a *prima facie* violation of the regulation, their treaty rights, as a matter of law, preclude a finding of guilt. They claim that the Boundary Waters Canoe Area Wilderness Act of 1978, 92 Stat. 1640 ("the BWCAW Act") and its accompanying regulations may not be enforced against the Bands insofar as they affect fishing rights guaranteed by the 1854 Treaty. Defendants assert that, as members of the Bois Forte Band, their fishing activities in the ceded territory are subject only to regulation by the Bands and not by the United States government. Furthermore, they claim that the 1854 Treaty necessarily included the right to access fishing grounds through the use of available methods of travel.

Finally, Defendants argue that the United States Congress never intended to abrogate, condition, or limit the exercise of the 1854 Treaty rights when drafting the BWCAW Act. There are two alternate grounds upon which Defendants' motion must be denied.

2. *The Signatories to the 1854 Treaty Would Not Have Understood the Document to Include Unrestricted Travel to and From Protected Fishing Grounds.*

■ As stated above, the 1854 Treaty clearly provided the Chippewa with full usufructuary rights over the ceded lands. Usufructuary rights include the right to "live off the land;" that is, to make a modest living by hunting and gathering from the resources of the land. *See United States v. Bresette,* 761 F.Supp. 658, 660 (D.Minn.1991); *United States v. Gotchnik,* Cr. No. 94–05, 1995 WL 312012 (D.Minn. March 28, 1995); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341, 348 (7th Cir.1983), *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983).

■ Indian treaties are treated like federal statutes and can be modified by congressional mandate. *See Minnesota v. Mille Lacs Band of Chippewa,* 526 U.S. 172, ——, 119 S.Ct. 1187, 1200, 143 L.Ed.2d 270 (1999); *United States v. Dion,* 476 U.S. 734, 738, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986). However, a reviewing court must presume that a statute does not abrogate the specific treaty rights. Such an abrogation must be through a clearly intended Act of Congress. *See Mille Lacs,* 526 U.S. at ——, 119 S.Ct. at 1203 (*citing Dion,* 476 U.S. at 740, 106 S.Ct. 2216) (holding that the Federal government "ha[s] the sophistication and experience to use express language for the abrogation of treaty rights"). As the Supreme Court has held: "What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Dion,* 476 U.S. at 739–40, 106 S.Ct. 2216.

The prosecutions in this case were premised on a federal statute and regulations which cannot be read to modify or abrogate the rights reserved under the 1854 Treaty. Indeed, Section 17 of the BWCAW Act provides that: "[n]othing in this Act shall affect the provisions of any treaty now applicable to lands and waters, which are included in the mining protection area and the wilderness." The legislative history of the BWCAW Act further supports the absence of an intended congressional abrogation. The Act's Congressional committee report states:

> Section 17 makes clear that the legislation is not to affect the provisions of any treaty which is now in effect. The Boundary Waters are affected by international boundary treaties with Canada, as well as by certain Indian treaties. All these existing agreements are to remain unaffected by the enactment of this legislation.

Rep. of House Comm. on Interior and Insular Aff. (Rpt. No. 95–1117, Part I) (1978). The Defendants maintain valid treaty rights to hunt and fish in the ceded territory, therefore the United States must demonstrate that the prosecutions for the use of motorized vehicles do not offend the 1854 Treaty.

Magistrate Judge Erickson considered the same issue in *United States v. Gotchnik,* 1995 WL 312012, at *3 ("*Gotchnik I*").[1] In that case, Gotchnik was cited for the use of a snowmobile in the BWCAW and raised the same affirmative defense as in the instant case. Judge Erickson found that, "it is not the existence of the usufructuary rights that were retained under the 1854 Treaty that are at issue but, rather, the nature and extent of the usufructuary rights that are open to contention." *Id.* at *4 (*citing Bresette,* 761 F.Supp. at 662).

1. The defendant in *Gotchnik I* is the same individual as in the instant matter.

Here, as in *Gotchnik I,* there is no dispute that the Treaty allowed the Defendants to hunt and fish in the ceded territory. Congress has not abrogated that right. Instead, the operative question is whether the Chippewa would have understood the 1854 Treaty to protect their ability to travel to the most desired hunting and fishing locations by the latest technological means.

■■ It is well-settled that Indian treaties must be liberally construed in favor of Native Americans. *See State of Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 676, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); *Choctaw Nation of Indians v. United States,* 318 U.S. 423, 432, 63 S.Ct. 672, 87 L.Ed. 877 (1943). In order to determine the nature and extent of treaty rights, the "history of a Treaty, the negotiations, and the practical construction of it by the parties to it may all be considered when interpreting an Indian Treaty." *Mille Lacs Band of Chippewa v. Minnesota,* 861 F.Supp. 784, 791 (D.Minn.1994), *aff'd,* 124 F.3d 904 (8th Cir.1997), *aff'd,* —— U.S. ——, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999).

Defendants argue, without citation to any authority, that the rights guaranteed by the 1854 Treaty must also logically include the ability to meaningfully realize the benefits. If they are deprived the right to conveniently access the hunting and fishing grounds, Defendants claim that their rights to hunt and fish are rendered effectively hollow. *See* Def.Mem. in Supp. of Mot. for J. of Acq. at 5. Citing the Sixth Circuit Court of Appeals decision in *Grand Traverse Band of Ottawa and Chippewa Indians v. Director, Michigan Dept. of Nat. Res.,* 141 F.3d 635 (6th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 590, 142 L.Ed.2d 533 (1998), Defendants point out that the 1854 Treaty "did not in any way, limit the means by which fish were to be taken from the lakes or restrict the treaty fishers to using technology that was in existence at the time of the treaty." *Id.* at 639. Defendants argue that treaties such as those at issue here and in *Grand Traverse* must contain an "easement of access" to the fishing grounds in order to properly effectuate the treaty rights.

■ Although Defendants advance an interesting argument, the facts of this case are distinguishable from the *Grand Traverse* situation and warrant a different result. In *Grand Traverse,* the State of Michigan prohibited the Indians from mooring large fishing vessels at public marinas, allowing only the use of smaller, "trailered" boats which could be removed from the water each day. The prohibition on the docking of larger boats operated to effectively bar the tribal members from accessing protected fishing banks far out into Lake Michigan—an area which smaller vessels were unable to reach. *Id.* at 637. Without the ability to moor their large fishing boats, their "easement of access" to the distant banks was completely eliminated. *Id.*

By prohibiting Steptec and Gotchnik from accessing the BWCAW using motorized vehicles, the United States has not completely foreclosed Defendants from exercising their fishing rights. Rather, the United States has merely made the exercise of fishing rights in the most remote areas of the BWCAW less convenient. *See Gotchnik,* 1995 WL 312012, at *6. Regulations prohibiting the use of snowmobiles or boat motors "[do] not deny the full exercise of those rights." *Id.* As the prosecution argues, "[e]very year there are over 100,000 people who comply with the motorized restrictions and engage in activities such as fishing—the very activity defendants were engaged in when they were cited." Gov't Mem. in Opp. to Mot. for J. of Acq. at 16.

There is no evidence to suggest that the signatories of the 1854 Treaty would have understood the document to allow for unrestricted travel to and from off-reservation fishing and hunting areas through the

use of the most advanced technological means. Indeed, this ruling does nothing to diminish the extent of the rights held by the Chippewa at the time the Treaty was signed.

### 3. The Regulations Prohibiting the Use of Motorized Equipment in the BWCAW Are Valid "Conservation Measures" Which Preempt Existing Treaty Rights.

Alternatively, the United States maintains that the BWCAW Act is a permissible, nondiscriminatory conservation measure. See Puyallup Tribe v. Dept. of Game, 391 U.S. 392, 396, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) ("... the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation ..."). The government may regulate the exercise of the protected activity in the interest of conservation "provided the regulation meets appropriate standards and does not discriminate against the Indians." Id. at 397, 88 S.Ct. 1725; see also Mille Lacs, 952 F.Supp. at 1369. The Supreme Court reaffirmed this principle in its most recent Indian law decision. See Mille Lacs, 526 U.S. at ——, 119 S.Ct. at 1204 ("We have repeatedly reaffirmed state authority to impose reasonable and necessary nondiscriminatory regulations on Indian hunting, fishing and gathering rights in the interest of conservation.").

To show that a particular regulation meets the Puyallup standard, the government "must demonstrate that its regulation is a reasonable and necessary conservation measure and that its application to the Indians is necessary in the interests of conservation ..." Puyallup,

391 U.S. at 397, 88 S.Ct. 1725 (citing Lac Courte, 668 F.Supp. at 1241).[2]

The BWCAW Act vested the Secretary of the Interior with the power to regulate the BWCAW in concert with the enforcement provisions of the earlier Wilderness Act of 1964, 16 U.S.C. § 1131, et seq., ("the Wilderness Act"). Section 1133(c) of the Wilderness Act "prohibits the use of motorized vehicles in any wilderness area." The BWCAW Act modified this strict prohibition on motorized vehicle use by allowing snowmobile and motorboat operation in limited areas of the park. Specifically, section 4(e) of the BWCAW Act provides that "use of snowmobiles in the wilderness designated by this Act is not permitted ... except in certain areas, authorizing special use permits for the grooming by snowmobiles of specified cross-country ski trails near existing resorts and use along two designated overland portages running to Canada."[3] 92 Stat. 1649, § 4(e). The Act similarly limits the use of motorized boats to designated areas. Id. The Forest Service has adopted regulations to specifically govern the BWCAW's restrictions on the use of motorized vehicles. See 36 C.F.R. § 261.16.

Nearly all of the courts adopting the Puyallup holding have upheld state regulations designed to protect individual species of fish or game. See, e.g., Washington State Comm. Passenger Fishing Vessel Assn., 443 U.S. at 682, 99 S.Ct. 3055 (upholding state regulations protecting anadromous fish species); Mille Lacs Band of Chippewa v. State of Minnesota, 952 F.Supp. 1362 (D.Minn.1997) (deer, walleye pike, and muskellunge); Lac Courte, 707 F.Supp. at 1034 (walleye and muskellunge). The question remains as to whether the Puyallup conservation exception should be applied to the protection of a

2. While most of the regulations at issue in the various Indian Treaty cases are state law provisions, the Puyallup principle has also been extended to Federal government regulation of the exercise of treaty rights. See Dion, 476 U.S. at 734, 106 S.Ct. 2216 (abrogation of Yankton Sioux rights to hunt bald and golden

eagles); Bresette, 761 F.Supp. at 658 (Migratory Bird Treaty Act did not abrogate treaty right to sell bird feathers).

3. The snowmobile regulations also encompass the use of ATVs like that driven by Steptec.

wildlife area in general, as opposed to the conservation of an individual species. As the Ninth Circuit held in *United States v. Dann,* 865 F.2d 1528, 1538 (9th Cir.1989) (subjecting land protected by Indian treaty rights to limited regulation of federal grazing rights by the Bureau of Land Management), and Magistrate Judge Erickson ruled in *Gotchnik I,* 1995 WL 312012 at *8 n. 12, such an application is appropriate here.

Congress enacted restrictions on motorized vehicle use to maintain the pristine nature of Minnesota's north woods. The BWCAW is one of the largest, well-used wilderness areas in North America. The restrictions on motorized vehicle use are intended to preserve the solitude of the region, protect sensitive ecosystems, and minimize oil and gasoline emissions into the lakes. These prohibitions are integral to Congress' goal of providing an experience in which "the imprint of man is substantially unnoticeable." 16 U.S.C. § 1131(c).

■ No issue has been raised regarding discriminatory enforcement of the motorized use restrictions in the BWCAW. They apply to both Indians and non-Indians. Indeed, the restrictions have been enforced against the general public since their inception. The Court agrees with the United States that these non-discriminatory regulations are reasonable and necessary conservation measures and that their application to tribal members and non-members alike is in the interest of conservation of the BWCAW. This "conservation exception" pursuant to *Puyallup* is a second basis upon which Defendants' request for the entry of a judgment of acquittal on the motorized vehicle counts must be denied.

### B. Steptec's Fishing Equipment Count

In the second count of his citation, Steptec has been charged with "possessing motorized equipment within designated wilderness area," in violation of 36 C.F.R. § 261.16(a), based upon his use of a power ice auger within a restricted area of the BWCAW. The use of fishing equipment presents a different issue than that raised by the claimed right to motorized travel to and from fishing grounds. Cases clearly hold (and the United States concedes) that tribal members are not precluded from using hunting and fishing implements that are more modern than those used when the Treaty of 1854 was enacted. *See Mille Lacs,* 952 F.Supp. at 1366; *Lac Courte,* 653 F.Supp. at 1430. As such, the United States may limit a tribal member's use of modern fishing equipment only if it is an aspect of a valid, non-discriminatory conservation measure. *See Puyallup,* 391 U.S. at 395, 88 S.Ct. 1725.

■ While the prohibition on the use of motorized travel throughout the BWCAW is vital to maintain the conservation of the Wilderness Area, the conservation interest in preventing the occasional drilling of a fishing hole with the use of a motorized auger is more uncertain. The use of fishing equipment itself falls squarely within the conduct protected by the 1854 Treaty. Unless the United States can demonstrate a sufficient conservation interest, it may not abridge the tribal right to use available fishing equipment and methods absent a direct abrogation of that right by Congress. Defendant Steptec's Motion for Judgment of Acquittal as to his citation for use of the motorized ice auger is granted.

### IV. CONCLUSION

Based upon the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Steptec's Motion for Entry of Judgment of Acquittal as to Citation No. F064176 ("Using Motor Vehicle in Designated Wilderness Area (ATV)") is **DENIED;**

2. Defendant Steptec's Motion for Entry of Judgment of Acquittal as to Citation No. F064177 ("Possessing Motorized Equipment Within Desig-

nated Wilderness; Auger") is **GRANTED**; and,

3. Defendant Gotchnik's Motion for Entry of Judgment of Acquittal as to Citation No. F064197 ("Motorized in Non–Motor Area (U.S. Point) within BWCA Wilderness") is **DE-NIED.**[4]

4. All remaining issues in this matter are referred to Magistrate Judge Raymond L. Erickson for disposition. The parties are ordered to contact Judge Erickson's clerk, Vicki Miller, to obtain a date and time for further proceedings.