# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2510

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeals from the United States |
| | * | District Court for the District |
| Duane Huber, | * | of North Dakota. |
| | * | |
| Appellant. | * | |

_____

No. 03-2517

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Huber Farms, Inc., | * |
| | * |
| Appellant. | * |

_____

No. 03-2520

_____

United States of America,          *
                                             *

        Appellee,           *
                                             *

     v.                  *
                                             *

Huber Farms General Partnership,   *
                                             *

        Appellant.          *

_____

No. 03-2854

_____

United States of America,          *
                                             *

        Cross-Appellant,    *
                                             *

     v.                  *
                                             *

Duane Huber; Huber Farms, Inc.;   *
Huber Farmers General Partnership, *
                                             *

        Cross-Appellees.    *

_____

Submitted: June 16, 2004
Filed: April 21, 2005

_____

Before SMITH, BEAM, and COLLOTON, Circuit Judges.

_____

BEAM, Circuit Judge.

Duane Huber, Huber Farms General Partnership (HFGP), and Huber Farms, Inc. (HFI) were convicted of violating various federal laws dealing with fraudulent statements to the government, tax fraud, and money laundering. The district court sentenced Huber to sixty-months' imprisonment, and it sentenced HFGP and HFI to terms of probation. The court also ordered that Huber forfeit approximately $5.9 million in the form of a money judgment for the money-laundering charge. The court declined to impose a fine or restitution on any defendant. Huber, HFGP, and HFI assign five errors to the district court in this appeal. Huber also appeals the forfeiture judgment. The government cross-appeals, assigning approximately eight sentencing errors. We affirm in part, reverse in part, and remand for resentencing.

## I.    BACKGROUND

Duane Huber, doing business as HFGP and HFI, operated a large farming operation in North Dakota. Steven Huber, Jeff Greff, Douglas Bergan, and Chad Bickett were involved with Huber in what Huber claimed was a "coordinated farming" operation. According to Huber, he, HFGP, and HFI facilitated these individuals' farming efforts by renting or sub-leasing land to them, providing the machinery that was used on their farms, providing the labor force that worked the land, and cosigning the individuals' operating notes. Like many farmers, Steven Huber, Greff, Bergan, and Bickett enrolled in the federal farm program by submitting a form (Form 502) to the local Farm Services Administration (FSA) office, representing their eligibility to participate in the program.[1] Once enrolled, these individuals could receive payments under a variety of federal-farm-program mechanisms. The four also insured their crops against loss through federally

---

[1]Many of the questions on the Form 502 are geared at determining whether the applicant for enrollment meets the eligibility requirement of being "actively engaged in farming." 7 C.F.R. §§ 1400.201-1400.212 (defining the term).

subsidized crop insurance, again representing their eligibility to purchase such policies. During the typical year, they received income from the government through the federal farm program, from private insurers through claims on their crop-insurance policies, and through grain sales. This money was then paid to Huber, HFGP, HFI, or third parties. Huber claimed these payments were for the land, machinery, and labor he provided to them.

The government viewed these four individuals' involvement with Huber's farming operation differently. According to the government, Huber enlisted them to defraud government programs of millions of dollars in benefits in the form of farm-program payments and federally subsidized crop-insurance benefits. This belief rested on the notion that these individuals were not eligible to receive such benefits because they had no farms of their own. More specifically, the government believed that the group had set things up to look as though they were eligible to enroll in the federal farm program—i.e., to look like they were "actively engaged in farming." Once the four had fraudulently enrolled by submitting false Form 502s, the government believed they funneled the ensuing farm-program payments (along with crop-insurance benefits and grain-sales proceeds) to Huber and others in the form of expenses—land, labor, machinery, etc.—the individuals never incurred. By structuring things this way, Huber could avoid the payment limitations that applied to him under the farm program. The government also believed that the crop-insurance benefits the four individuals received were fraudulently obtained because none of the them had an insurable interest in the crops they insured—i.e., they were ineligible to purchase federally subsidized crop-insurance policies. Finally, the government believed that Huber allocated expenses and income amongst the four individuals, Huber, HFGP and HFI as part of the scheme, violating various tax-reporting laws.

The government presented its case to a grand jury, which returned a twenty-count indictment, charging Huber, HFGP, and HFI with various violations of federal

law.  The indictment also included a forfeiture allegation.  At trial, the government produced witnesses that were allegedly part of Huber's operation and experts on federal-farm-program and crop-insurance eligibility, as well as tax-reporting requirements.  The jury found Huber, HFGP, and HFI guilty of all charges.

The jury, in a subsequent forfeiture proceeding, was also charged with determining the amount of funds involved in the conspiracy to launder money that was charged in Count Eighteen of the indictment.  The jury concluded, by a preponderance of the evidence, that Huber was accountable for $5,876,970.  This amount reflected the value of federal-farm-program payments, crop-insurance benefits, and crop-sales proceeds received by Greff, Bergan, Steven Huber, and Bickett from 1994 through 1999.

The district court sentenced Huber to sixty-months' imprisonment, declining to enhance Huber's sentence as requested by the government.  And the district court entered a money judgment against Huber for the $5,876,970 the jury found should be forfeited.

Huber, HFGP, and HFI appeal their convictions.  Huber also assigns error with regard to the forfeiture phase of the proceeding.  The government cross-appeals with regard to sentencing.

## II.   DISCUSSION

### A.   Huber's Appeal

Huber's brief[2] raises approximately six assignments of error: the district court erred in concluding that (1) Dawn Rose's involvement in the investigation did not render her testimony or the evidence she helped procure inadmissible, (2) Rose's testimony about what Bergan told her was admissible, (3) Huber had not been selectively prosecuted, (4) sufficient evidence supported the jury's verdict, (5) the amount of the forfeiture judgment was proper, and (6) Huber's due process rights had not been violated by a late disclosure of incriminating evidence. Huber raised the first two purported errors below in an appropriate motion to suppress. The remaining claims were raised in a Rule 29 motion for a judgment of acquittal, but the only proper basis for such a motion is insufficient evidence of guilt. Fed. R. Crim. P. 29. The district court construed Huber's motion as one under Rule 33 (new trial) to the extent such a motion was the proper method of asserting his late-disclosure claim,[3] and it addressed his selective-prosecution claim even though it was raised for the first time in the Rule 29 motion.

---

[2]This brief, filed on behalf of all appellants, does not delineate whether and which assignments of error also apply to HFGP, HFI, or both. This omission also occurred below. The district court found that Huber was the only party to the motion that raised these errors. That conclusion is not challenged here. So it appears that HFGP and HFI can only have whatever claims they may be making reviewed for plain error. In any event, because we find that the district court did not err in its disposition of Huber's claims (aside from the forfeiture judgment that was imposed only against Huber), we find no error as to the other two defendants, plain or otherwise.

[3]We express no opinion on the propriety of this construction.

### 1.    Rose's Involvement

Dawn Rose kept Huber's books in conjunction with the farming operation. Special Agent Ward, the government's main investigating officer in Huber's case, approached her on August 5, 1999, and asked her some questions about Huber's operation.  On that day, she offered to turn over the financial data she had in her possession.  Agent Ward declined the offer, advising her to wait until he could present her with a grand-jury subpoena.  He returned with that subpoena on August 9, 1999, along with an offer of immunity for her cooperation. Rose then gave him the information.

At trial the government offered evidence gleaned from this information—the allocation of expenses and income with regard to Huber and each of the individuals allegedly involved in the conspiracy.  Huber moved to suppress the evidence and the court held a hearing out of the jury's presence.  At that hearing, the district court questioned Rose extensively about her motivation to assist the government.  She testified that she turned over the information voluntarily and that she collected no information at the government's behest.  Even though she continued to enter data into the bookkeeping software from August 5 until August 9, she said she did this at Huber's direction.

The district court denied Huber's motion to suppress, citing a lower expectation of privacy in business records, the grand-jury subpoena, and inevitable discovery. The court concluded that Rose was not an agent of the government and "she was trying to protect herself."  Huber renewed his challenge to the evidence in his Rule 29 motion.  The district court again addressed the issue, restating its conclusion that Rose was not an agent of the government and, thus, the information she gave to the government was not obtained improperly under the Fourth Amendment.

Huber challenges the district court's ruling on his motion to suppress, claiming Rose was a government agent for purposes of the Fourth Amendment after she spoke with Agent Ward on August 5. We review the denial of a motion to suppress for clear error when the appellant challenges the district court's factfinding, and de novo with regard to its "interpretation of the protections afforded by the Fourth Amendment." United States v. Smith, 383 F.3d 700, 704 (8th Cir. 2004). A private citizen's conduct[4] can nonetheless implicate the Fourth Amendment if the private citizen is acting as a government agent. The Fourth Amendment analysis with regard to whether a private citizen acted as a government agent includes several factors–"whether the government had knowledge of and acquiesced in the intrusive conduct; whether the citizen intended to assist law enforcement agents or instead acted to further his own purposes; and whether the citizen acted at the government's request." Id. at 705.

Agent Ward did ask Rose to turn over the data in her possession on August 9. However, the grand-jury subpoena, the validity of which Huber does not challenge, required her to produce it. And while Agent Ward knew as of August 5 that Rose had information that could be helpful to his investigation, there is no evidence in the record from which the district court could conclude that Agent Ward acquiesced in, knew about, or asked Rose to engage in any of the other actions she took. Rose may have been motivated, to some extent, by an urge to help the government, either as a means of protecting herself through the prospect of immunity or by the "simple but often powerful convention of openness and honesty." Coolidge v. New Hampshire, 403 U.S. 443, 488 (1971). But this is not enough to make her a government agent. See United States v. Malbrough, 922 F.2d 458, 462 (8th Cir. 1990). We find no error in the district court's denial of the motion to suppress.

---

[4]It is not clear from Huber's brief whether he is complaining of an improper search or an improper seizure of the data Rose gave Agent Ward. Because we conclude the district court did not err with regard to Rose's government-agent status, we need not address this question.

## 2. Hearsay Evidence

Next, Huber assigns error to the district court's admission of evidence in the guilt phase of the proceeding under Federal Rule of Evidence 801(d)(2)(E) (coconspirator's statement). Huber claims the district court allowed Rose to testify to what Bergan said about the farming relationship Bergan had with Huber. Huber, however, cites us to no place in the record where Rose testified to, or based her testimony upon, what Bergan told her. Nor does he note the location, if any, of his objection to this testimony. Rose's testimony spans 191 pages of transcript, and our review of the record has not disclosed the basis for the error Huber asserts. Thus, we affirm the district court's admission of Rose's testimony.

Huber also assigns error to the district court's failure to make an explicit finding of admissibility on the record. See United States v. Bell, 573 F.2d 1040 (8th Cir. 1978). However, Huber did not request such a ruling, the district court heard and ruled on Huber's motion for acquittal, and we find no plain error in its determination. United States v. McCracken, 110 F.3d 535, 542 (8th Cir. 1997) (employing plain-error standard under similar circumstances).

## 3. Selective Prosecution

Huber raised a selective-prosecution claim in his Rule 29 motion. This claim was not properly before the district court because Huber raised it for the first time in a Rule 29 motion. A selective-prosecution claim "alleg[es] a defect in instituting the prosecution" that "must be raised before trial," Fed. R. Crim. P. 12(b)(3)(A). Otherwise, it is waived. Fed. R. Crim. P. 12(e); United States v. Dion, 762 F.2d 674, 680 (8th Cir. 1985), reversed in part on other grounds, 476 U.S. 734 (1986). Nonetheless, the district court considered the claim. Under Rule 12(e), it could grant relief from the waiver for "good cause." But the district court did not mention Rule 12(e). Huber claims that he could not have discovered the basis for the claim until

the prosecutors touted the one-of-a-kind nature of the prosecution to the press after the trial. But Huber did not present that to the district court as "good cause." Despite this lack of clarity, we will assume that the district court properly considered this aspect of Huber's motion, because we affirm the district court's decision on the merits of the claim.

The district court held that Huber had not made out a prima facie case of selective prosecution because he had not established that (1) he was "singled out for prosecution while others similarly situated were not prosecuted for similar conduct," and (2) the decision to prosecute him was "based on an impermissible motive such as race, religion, or an attempt by the defendant to secure other constitutional rights." United States v. Kelley, 152 F.3d 881, 886 (8th Cir. 1998) (quotation omitted). Huber argues that the prosecutors' statements relating to the ingenuity of this prosecution establishes his prima facie case. We disagree. Even if a prosecution is rare, that does not mean the government chose to charge the defendant because of his race, his religion, or some other attempt he made to secure his constitutional rights. And Huber has made no showing that others similarly situated have been left unprosecuted. Accordingly, the district court did not abuse its discretion. Id. (standard of review).

### 4. Guilt-Phase Evidentiary Sufficiency

"In reviewing a district court's denial of a motion for acquittal based on the insufficiency of the evidence, we view the evidence in the light most favorable to the verdict and will reverse only if no reasonable jury could have found beyond a reasonable doubt that the defendant is guilty of the offense charged." United States v. Lacey, 219 F.3d 779, 783 (8th Cir. 2000). Much of what Huber argues with regard to the sufficiency of the evidence pertains more to the forfeiture proceeding than the guilty verdict. The arguments pertaining to forfeiture are discussed below. As to the evidentiary sufficiency of the guilty verdict, Huber does not identify which counts of

the indictment, let alone which elements of those counts, are lacking evidentiary support. In fact, he makes no mention of the statutory provisions at issue, leaving us to wallow in the twenty-count indictment, eighteen of which name Huber, and the voluminous record of the proceeding below.

Count One charged Huber with conspiring to make false statements to influence the actions of the Department of Agriculture in connection with claims for crop insurance and federal-farm-program benefits, in violation of 18 U.S.C. §§ 371 (conspiracy), and 1014 (false statements to influence the actions of various government agencies). Counts Two, Three, and Four charged Huber with aiding and abetting[5] various fraudulent acts that violated 18 U.S.C. §§ 1001 and 1014, and 15 U.S.C. § 714m(a). Counts Six,[6] Seven, Eight, Nine, and Ten charged Huber with various tax-reporting violations under 26 U.S.C. §§ 7206(1) and (2), and with aiding and abetting such unlawful conduct by Greff, Bergan, Bickett, and Steven Huber. These charges relate to Huber's allocation of income and expenses amongst these four individuals. Counts Twelve, Thirteen, Fourteen, Fifteen, Sixteen, and Seventeen charged Huber with aiding and abetting various money-laundering violations under 18 U.S.C. §§ 1956(a)(1)(A)(i) and (B)(i), and 1957. Count Eighteen charged Huber with conspiring to commit money laundering in violation of 18 U.S.C. § 1956(h). Counts Nineteen and Twenty charged Huber with aiding and abetting mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, respectively.

One discernible argument from Huber's brief cites the lack of evidence of a bribe that Huber was alleged to have paid the coconspirators. We take this argument

---

[5]18 U.S.C. § 2 makes one who aids and abets "punishable as a principal."

[6]Count Five charged HFGP with violating 26 U.S.C. § 7206(1) (tax-reporting violations). If HFGP is appealing the evidentiary sufficiency of this conviction, see ante n.2, there was no plain error.

to attack the evidence of one of the many overt acts alleged in the indictment with regard to Count One. Even if there were no evidence of this overt act, Huber's claim would fail. The government is not bound to prove each and every overt act alleged in the indictment. United States v. Sellers, 603 F.2d 53, 56 (8th Cir. 1979), vacated on other grounds, 447 U.S. 932, aff'd, 628 F.2d 1085 (8th Cir. 1980).

Huber may also be making his bribery/overt-act argument with regard to the conspiracy charged in Count Eighteen—a conspiracy to launder money in violation of 18 U.S.C. § 1956(h). A close reading of the indictment, however, suggests that no overt act was alleged in Count Eighteen, and the jury instructions on this count did not include an overt-act element. Section 1956(h) does not require any such act be charged or proven. Whitfield v. United States, 125 S. Ct. 687 (2005). So Huber's overt-act arguments miss the mark for another reason with regard to his section 1956(h) conviction.

We have carefully examined the evidence presented to the jury, United States v. Kenyon, 397 F.3d 1071, 1076 (8th Cir. 2005), in light of Huber's other sufficiency-of-the-evidence arguments pertaining to guilt. We find them to be without merit.

### 5.    Forfeiture

Huber argues that there was insufficient evidence for the jury to conclude that the amounts of money included in Forfeiture Exhibit 1 were involved in the conspiracy to launder money. Forfeiture Exhibit 1 is a spreadsheet summarizing other evidence of payments received by the coconspirators. It depicts the amounts of money that Bickett, Greff, Steven Huber, and Bergan received in their bank accounts as farm-program payments, crop-sales proceeds, and crop-insurance benefits. The jury found that Huber was accountable for all of these amounts, totaling approximately $5.9 million.

The amount of forfeiture was submitted to the jury based solely on Count Eighteen of the indictment, and the court ordered forfeiture only with regard to that count in the form of a money judgment. See Fed. R. Crim. P. 32.2. The criminal forfeiture statute invoked in the forfeiture allegation was 18 U.S.C. § 982, which requires a court to impose forfeiture on a defendant convicted of 18 U.S.C. § 1956 as to "any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1). Forfeiture under section 982(a)(1) in a money-laundering case allows the government to obtain a money judgment representing the value of all property "involved in" the offense, including "the money or other property being laundered (the corpus)," and "any property used to facilitate the laundering offense." United States v. Hawkey, 148 F.3d 920, 927 (8th Cir. 1998) (quotation omitted).

The theory of forfeiture that the government appears to present in this case is that the farm-program payments, the crop-sales proceeds, and the crop-insurance benefits represent the corpus of the money-laundering conspiracy. While that reasoning is sound with regard to most of the funds, we conclude Huber's argument has merit with regard to that portion of crop-insurance benefits that the individuals never received.

The corpus of a money-laundering conspiracy is the funds that the defendant conspired to launder. Thus, the corpus of a money-laundering conspiracy rests on whether certain conduct involving funds constitutes money laundering. To determine that, we look to the statutory text, winnowed by the allegations of the indictment. Count Eighteen alleged a conspiracy to engage in money laundering under 18 U.S.C. § 1956(h). Section 1956(h) outlaws conspiracies to commit "any offense defined in this section or section 1957." The offenses charged as the objects of the conspiracy were violations of sections 1956(a)(1) and 1957. A person violates section 1956 if he (1) engages in a "financial transaction" that (2) "involves the proceeds of specified unlawful activity," and (3) either engages in the transaction to "promote" further acts

-13-

of specified unlawful activity or with knowledge of a design to conceal the nature, ownership, or control of the funds being laundered. 18 U.S.C. §§ 1956(a)(1)(A)(i) & (B)(i). For our purposes, section 1957 is different only with regard to the third element. That is, no intent to promote or knowledge of a design to conceal is required, but the transaction must consist of property with "a value greater than $10,000." 18 U.S.C. § 1957(a). If the amounts included in the jury's verdict reflect the value of property that Huber and the other individuals conspired to launder in violation of these statutory provisions, then the forfeiture verdict and the ensuing judgment were proper.

### (a) Farm-Program Payments

With regard to the farm-program payments, the funds were deposited in the four individuals' bank accounts. The indictment characterizes the money-laundering conspiracy as involving further transactions from the individuals' accounts to Huber or third parties that were labeled as payments for machinery, labor, and land. Those payments, made by check, are qualifying transactions. 18 U.S.C. §§ 1956(c)(3) (defining "transaction"), 1956(c)(4) (defining "financial transaction"), 1957(f)(1) (defining "monetary transaction").

The farm-program payments the individuals received also qualify as "proceeds of specified unlawful activity." Count Eighteen alleged that the farm-program payments were obtained through violations of 18 U.S.C. §§ 1014, 1341, and 1343. "Specified unlawful activity" includes violations of 18 U.S.C. § 1014 and "any act or activity constituting an offense listed in section 1961(1)," which includes mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. 18 U.S.C. § 1956(c)(7). The jury returned a guilty verdict on other counts of the indictment that charged Huber with violating those provisions, and Huber has not successfully challenged the propriety of those findings. Thus, the jury could reasonably conclude

that the qualifying transactions involved farm-program payments that were proceeds of specified unlawful activity.

Finally, the jury could reasonably conclude that the transactions were undertaken either to promote the farm-program-payment scheme or with knowledge of a design to conceal the ownership, nature, or control of the funds derived from that scheme. 18 U.S.C. §§ 1956(a)(1)(A)(i) & (B)(i). On paper, these transactions were made to appear as payments for the expenses associated with producing crops on the lands allocated to the four individuals. But the evidence at trial showed that the individuals incurred no expenses. A reasonable jury could therefore conclude that the payments—the transactions at issue—helped maintain the individuals' appearance of eligibility because those expenses, if legitimately incurred by them, would help establish that they were "actively engaged in farming." This, in turn, "promoted the carrying on of" the scheme to defraud the government, which involved specified unlawful activities. 18 U.S.C. § 1956(a)(1)(A)(i). The jury could also reasonably conclude that the payments were made with knowledge of a design to conceal the true ownership or control of the unlawfully obtained funds. Indeed, concealing Huber's involvement bolstered the individuals' appearance of eligibility. Thus, a reasonable jury could conclude that the conspiracy involved violations of sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), or both. See United States v. Wilkinson, 137 F.3d 214, 220-23 (4th Cir. 1998). Therefore, the jury properly included the amount of farm-program payments in its forfeiture calculation under section 982(a)(1) as part of the corpus of the section 1956(h) conspiracy.

### (b) Crop-Sales Proceeds

Huber argues that the value of the crop-sales proceeds should not have been included in the forfeiture judgment. The money the four individuals received from the sale of crops is not derived from a specified unlawful activity. Selling crops is not illegal, even if the seller falsifies his farm-program or insurance eligibility. Thus,

these monies do not immediately appear to be the "proceeds of specified unlawful activity." The government proceeded in the indictment, in its brief, and at oral argument on a commingling theory of forfeitability with regard to these funds.

The crop-sales proceeds were properly forfeited under section 982(a)(1). As part of the money-laundering conspiracy, Huber would place or direct others to place crop-sales proceeds in the individuals' bank accounts. Illegitimate funds from the government were also placed in those accounts and commingled with the legitimate funds. As explained above, the payments from those accounts constituted money laundering because they were financial transactions made for, or with knowledge of, an unlawful purpose, and they "involve[d] the proceeds of specified unlawful activity"—the farm-program payments. The presence of legitimate funds made the transactions no more lawful because the transactions still *involved*[7] the illegitimate proceeds. United States v. Habhab, 132 F.3d 410, 414-15 (8th Cir. 1997). We can find no basis to conclude that the crop-sales proceeds, although lawfully obtained, were not also laundered in violation of the statute when they were part of the money-laundering transactions. As funds Huber conspired to launder, they were properly included in the forfeiture judgment as part of the corpus of the money-laundering conspiracy. See United States v. Baker, 227 F.3d 955, 969 (7th Cir. 2000).

Huber argues that the crop-sales proceeds should have been offset by the expenses that went into producing the crops that generated those funds. But he offers

_____

[7]Section 1956 says that it is unlawful to conduct a financial transaction that "involves" the proceeds of specified unlawful activity. Section 1957, on the other hand, makes it unlawful to engage in a monetary transaction "in" property that is derived from specified unlawful activity. 18 U.S.C. § 1957(a). "In" and "involves" may have different meanings. Thus, the scope of the corpus may be somewhat narrower under section 1957, than it is under section 1956. However, there is no indication in this case that the crop-sales proceeds were involved in transactions that violated only section 1957. So we need not, and do not, express an opinion on the matter.

-16-

no authority for this proposition. Huber appears to argue that he could not be forced to forfeit all of the crop-sales proceeds that were funneled through the individuals' accounts because the payments made to Huber were for expenses he actually did incur in producing the crops on the land he allocated to those individuals. Two problems exist with that argument. First, the legitimacy of those expenses was brought into question by the evidence at trial. And, second, even if the expenses were legitimately incurred *by Huber*, they would not reduce the amount subject to forfeiture. See United States v. Grasso, 381 F.3d 160, 166-69 (3d Cir. 2004) (collecting cases and concluding that expenses should not be deducted), vacated on other grounds, No. 04-858, 2005 WL 694108 (U.S. Mar. 28, 2005); cf. United States v. Simmons, 154 F.3d 765, 770-71 (8th Cir. 1998). Indeed, the passing of those expenses to individuals who had not incurred them promoted the underlying fraud, which is what, inter alia, made the transactions illegal. Huber's argument fails.

### (c)   Crop-Insurance Benefits

Much of the reasoning above holds true for the crop-insurance benefits the individuals received. Like the farm-program payments, the crop-insurance benefits the individuals received were paid out of the individuals' accounts by check; the funds were obtained through violations of sections 1014, 1341, and 1343; and the transactions were undertaken to promote specified unlawful activity by maintaining the appearance of eligibility and/or with knowledge of a design to conceal Huber's involvement. Like the crop-sales proceeds, the received funds were also forfeitable because they were part of transactions that involved the proceeds of specified unlawful activity—the farm-program benefits. However, part of the value attributed to this category of funds represented monies that the individuals never received. So we must address whether that portion of these funds was involved in the money-laundering conspiracy.

Forfeiture Exhibit 1 was the basis for the forfeiture amount the jury found and, thus, the district court's forfeiture judgment. The exhibit included a portion of insurance benefits that were never received by Greff, Bickett, Bergan, or Steven Huber. To possibly oversimplify, under the federally subsidized crop-insurance program, once a claim is filed and approved, the insurer deducts the farmer's share of the premium from the claimed amount of loss, and the insurer receives a subsidy from the government to pay the remaining portion of the policy premium. The government included in its forfeiture calculations both the amount of the premium withheld by the insurer (the "premium charge") and the amount the government paid to the insurer (the "premium subsidy"). Huber argues that these funds were not subject to forfeiture under section 982(a)(1). We agree. These funds were not part of the corpus of the money-laundering conspiracy, nor are they forfeitable as property that facilitated the money-laundering conspiracy.

These funds were not part of the corpus of the money-laundering conspiracy. To violate section 1956, the defendant must "conduct[] or attempt[] to conduct . . . a financial transaction which in fact involves the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1). "Conducts" is defined as "initiating, concluding, or participating in initiating, or concluding a transaction." 18 U.S.C. § 1956(c)(2). "Transaction" is defined as including "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition." Id. § 1956(c)(3). And a "financial transaction" is defined as "a transaction . . . involving the movement of funds by wire or other means or . . . involving one or more monetary instruments." Id. § 1956(c)(4)(A). "Proceeds" is not defined.

As we have explained above, the transactions at issue with regard to the money the individuals actually received are the further payments from the individuals' accounts. The same sorts of transactions did not occur with the premium charges and premium subsidies because the funds never came into the individuals' accounts. With regard to the premium charges, no "financial transaction" occurred because no funds

ever moved and no monetary instruments were involved.[8] See 18 U.S.C. § 1956(c)(5) (defining "monetary instruments"). We are also not inclined to infer a transaction that did not occur, as the government seems to suggests we should do. See post n.10. For example, withholding payment on the insured's account for expenses the insured owed to the insurer (like a premium) could be tantamount to a full payment to the insured with a return payment for a portion of the policy's premium to the insurer. But, even if we were to infer such a transaction, the premiums are used to pay the claims made on the policies to insureds like the claimant. Taken in this light, the transaction is much closer to that addressed in Hawkey, where we held that a forfeiture amount had to be credited by the amount of misappropriated funds returned to the victim of the specified unlawful conduct. 148 F.3d at 928. Thus, the premium charges were not part of the corpus of the money-laundering conspiracy.

The premium subsidies—payments made by the government to the insurer—are a closer question. There, funds did move, likely by wire, so a "financial transaction" did arguably occur. And the situation cannot be characterized as a return of misappropriated funds. The question thus becomes whether the individuals conducted the transaction by "participating in initiating . . . a transaction," 18 U.S.C. § 1956(c)(2), and whether that transaction involved "proceeds." We do not believe the money-laundering statutes cover the situation at issue here. The coconspirators simply had no control over the funds involved in the transactions that occurred

---

[8]The definition of "monetary transaction" under section 1957 has been treated synonymously with a "financial transaction" thus far. The two are not perfectly synonymous. "'[M]onetary transaction' means the deposit, withdrawal, transfer, or exchange . . . by, through, or to a financial institution . . . ." 18 U.S.C. § 1957(f)(1). The "movement of funds" clause from section 1956(c)(4)(A) is not incorporated in the section 1957 definition of "monetary transaction." However, because the private insurers that withheld the premium charges do not appear to be financial institutions, and because the funds at issue were not deposited, withdrawn, transferred, or exchanged, the premium charges do not qualify as "monetary transactions" for purposes of section 1957(a).

-19-

between the insurer and the government. Thus, the funds never became proceeds of the unlawful activity, nor did the individuals participate in initiating the transaction.[9] Though actual possession may not be required, control must be shown to substantiate a charge of money laundering. See, e.g., United States v. Prince, 214 F.3d 740, 747-50 (6th Cir. 2000) (discussing issue and collecting cases); United States v. Bolden, 325 F.3d 471, 488 (4th Cir. 2003). Thus, the premium subsidies were not part of the corpus of the money-laundering conspiracy.

But were the premium subsidies and premium charges nonetheless forfeitable under section 982(a)(1)'s "involved in" clause through a facilitation theory? "Facilitation of a laundering offense occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." Hawkey, 148 F.3d at 928 (quotation omitted).[10] Facilitation is not to be confused with

---

[9]Similarly, if any of the government-to-the-private-insurer transactions exceeded $10,000, a fact we can find no evidence of in the record, we would ask whether the individuals "engage[d] or attempt[ed] to engage" in those transactions as part of the conspiracy. 18 U.S.C. § 1957(a). Again these transactions don't fill the bill.

[10]From the government's brief, it is not at all clear that it invokes this theory of forfeiture. The government's argument with regard to the funds the individuals never received is sparse: "In fact, they did received the money. It was simply offset against indemnity payments. The gross amount paid was the amount shown on Table I. Expenses are not deducted." Appellee's Br. at 48. That is it. There are no citations to the record, the complex statutory provisions at issue, or the voluminous case law associated with them. See George Chamberlin, J.D., What is Considered Property "Involved In" Money Laundering Offense, and Thus Subject to Civil or Criminal Forfeiture, for Purposes of Money Laundering Control Act, 135 A.L.R. Fed. 367 (1996) (collecting cases); William G. Phelps, J.D., Validity, Construction, and Application of 18 USCS § 1956, which Criminalizes Money Laundering, 121 A.L.R. Fed. 525 (1994) (collecting cases). And we can find no reason to conclude that the premium subsidies (unlike the premium charges, see ante) were offset against indemnity payments.

promotion under section 1956(a)(1)(A)(i).  Abstractly speaking, promotion and facilitation overlap: that which promotes, facilitates, and that which facilitates, promotes.  But the two have different applications.  Section 1956(a)(1)(A)(i) promotion is geared at the purpose of a transaction that involves funds unlawfully obtained—to promote (or facilitate) *the specified unlawful activities* that generate the funds being laundered.  When proceeds of specified unlawful activity are involved in a financial transaction that has as its purpose the promotion of specified unlawful activity, those funds are forfeitable as the corpus of the money-laundering offense.[11] But facilitation under section 982(a)(1)'s "involved in" clause is geared at the forfeitability of instrumentalities, including funds in some cases, that facilitate (or promote) *the money-laundering transactions*.  Often this theory is invoked to take computers or other objects used in the money-laundering enterprise.  Facilitating funds can be forfeited even if they were not part of the money-laundering transaction.

Causally speaking, the premium subsidies and premium charges did allow the individuals to receive the crop-insurance benefits.  After all, the government's role in this market is what makes this sort of insurance available to producers at reasonable rates, and premiums enable the insurer to pay insureds' claims.  But neither of these effects is sufficient to establish section 982(a)(1) facilitation because neither

----

We address the issue because the jury was instructed in the forfeiture proceeding that facilitating property could be forfeited and Huber challenges the jury's verdict, which concluded this property should be forfeited.

[11]As with the crop-sales proceeds in this case, forfeiture extends to any other commingled funds that are part of the transaction. We realize that when legitimately obtained funds are claimed to facilitate through commingling, it becomes difficult to keep these two concepts separate. We believe that if the legitimately obtained funds are part of a transaction that also involved proceeds of a specified unlawful activity, they are forfeitable as the corpus of the money-laundering offense; thus, there is no need to rely on the facilitation theory of section 982(a)(1). But if the funds do not actually move in the transaction, then the facilitation theory could be invoked.

-21-

promotes the money laundering. They do contribute in some way to the procurement of the funds, but they do not make the further laundering of those funds any "less difficult or more or less free from obstruction or hindrance." Hawkey, 148 F.3d at 928. Huber and the other individuals simply did not use the funds withheld by the insurer or the funds transferred between the government and the insurer to launder money. So these amounts were not recoverable through the forfeiture provisions because the funds were not involved in the money-laundering conspiracy within the meaning of section 982(a)(1).

Huber's brief represents that the premium charges totaled $649,368 and that the premium subsidies totaled $357,872. Appellants' Br. at 61. The government does not question these amounts, but we cannot reasonably verify the accuracy of Huber's representation because he offers no basis for his calculations or citations to the record that substantiate these amounts. Thus, the district court should determine these amounts on remand and reduce its forfeiture judgment accordingly.[12]

### 6.    Late Disclosure

Forfeiture Exhibit 1, which summarized various forms and amounts of income to Greff, Bickett, Bergan, and Steven Huber from 1994 through 1999, was not given to Huber until just before the close of the trial. Huber argues that his due process rights were violated by the late disclosure of this document[13] under Brady v.

---

[12]Because we leave the issue of restitution open on remand, see post, the district court may also evaluate the propriety of including these funds in a restitution order. We question, however, whether the premium charges even constitute a loss for restitution purposes.

[13]Huber's brief mentions other late disclosures. However, it makes no effort to describe the prejudice Huber suffered by this "pattern of repeated and persistent failure by the government to make timely disclosures of evidence." Appellants' Br. at 87. Accordingly, we reject these accusations as bases for Huber's due process

Maryland, 373 U.S. 83 (1963). We disagree. There was no exculpatory evidence in the exhibit or anything that could be used for impeachment. Thus, <u>Brady</u> did not require the exhibit's disclosure. <u>See</u> <u>United States v. Thomas</u>, 940 F.2d 391, 392 (8th Cir. 1991) (incriminating evidence is not favorable to the accused).

Huber also cites Rule 16, but does so without argument or authority. Fed. R. Crim. P. 16. Even if Rule 16 would have required a timely disclosure of this exhibit, and if the disclosure was indeed untimely, Huber does not explain his prejudice except in the most conclusory terms. As discussed at length above, all of the numbers the jury used from the exhibit to calculate the forfeiture were proper, except for the premium charges and premium subsidies that had been included in the crop-insurance column of the exhibit. Thus, to the extent Huber claims prejudice in his inability to detect that error, our judgment provides an appropriate remedy because it requires the district court to enter a forfeiture judgment that does not include those amounts.

We have considered all of the other arguments Huber raises, and we find them without merit.

## B.    The Government's Cross-Appeal: Sentencing

The district court made a valiant effort at finding an appropriate sentence for Huber, HFGP, and HFI under the United States Sentencing Guidelines. Various hearing transcripts, memoranda, filings, and quite intricate PSRs, complete with approximately 200 pages related to the parties' objections to them, appear in the record. Reluctantly, we vacate the sentences imposed and remand for resentencing because our changes to the forfeiture judgment lead us to believe the district court

claim because we have no indication of whether the items purportedly withheld were favorable to the accused or material to the case. <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667 (1985) (materiality); <u>United States v. Thomas</u>, 940 F.2d 391, 392 (8th Cir. 1991) (incriminating evidence is not favorable to the accused).

-23-

should be afforded the opportunity to resentence the defendants. We have concluded that the forfeiture amount, which represents the corpus of the laundered funds, could be approximately $4.9 million, rather than the $5.9 million the jury and the judge concluded should be forfeited. This amount played a key role in the district court's sentencing conclusions. The district court departed downward, in part, because the amount of laundered funds, which it derived from the jury's forfeiture verdict, "substantially overstate[d] the seriousness of Duane Huber's offense." Whether the reduced figure also does so is a matter the district court should consider in the first instance.

The government's cross-appeal assigns a variety of errors concerning the district court's guidelines calculations. Specifically, it claims the district court chose the money-laundering conspiracy count as the guideline with the highest offense level without calculating the offense level for the other counts of the conviction, misapplied the guideline it chose to apply and thereby failed to increase Huber's offense level for various specific offense characteristics that were present, failed to enhance Huber's base offense level under three provisions of Chapter 3, and erred in its downward departure.

In light of recent developments in the sentencing arena, namely United States v. Booker, 125 S. Ct. 738 (2005), and because we remand this case in any event, we decline to address many of the government's assignments of error. Because this case will be remanded and the district court will be operating under a new sentencing regime, we are not compelled to express an opinion about the district court's pre-Booker use of the guidelines. See United States v. Selwyn, 398 F.3d 1064, 1067 (8th Cir. 2005) (declining to address other sentencing issues raised on appeal after deciding to remand the case). "Because the district court might impose a different sentence on remand, and because the parties might choose not to appeal that sentence, consideration of objections to the court's original guidelines calculations would be

premature at best and unnecessary at worst." United States v. Coumaris, 399 F.3d 343, 351 (D.C. Cir. 2005).[14]

The government also argues that the district court erred in failing to impose a fine. The government argues that section 5E1.2(a) requires the district court to fine a defendant unless the defendant establishes that he is unable to pay. U.S.S.G. § 5E1.2(a). The guidelines, though, are now advisory. So the government's argument misses the mark. And there is no authority in the statutory text that mandates a fine for money laundering when a term of imprisonment is imposed. While we find no error in the district court's observation that the $5.9 million forfeiture judgment adequately covered the ground a fine would cover (with respect to Huber, HFGP, and HFI), we question whether the district court would reach the same conclusion now that the forfeiture amount has changed. So we leave the matter of a fine open on remand.

The district court also refused to order restitution because of the delay associated with the complex task of calculating the loss to the government. This is a permissible ground for refusing to award restitution. 18 U.S.C. § 3663A(c)(3)(B). The government assigns this as error without directly addressing the complexity of the loss calculations. But, rather than affirm this aspect of sentencing, we leave the matter open to the district court. Whether or not its reasons remain true on remand is a question it again should address.

Finally, Huber has filed Rule 28(j) letters with this court assigning as error the district court's imposition of sentence under the then-mandatory guidelines based on the forfeiture amount of laundered funds that, while proven to the jury, was not

_____

[14]The parties also have not addressed the impact of Booker and its "reasonableness" standard of review on this case.

proven beyond a reasonable doubt.[15] Huber at least has an argument under Apprendi, as applied in Booker, that the preponderance-of-the-evidence standard the jury used to calculate the amount of laundered funds violated his constitutional rights insofar as that factual conclusion was used as a basis for his sentence under the then-mandatory guidelines. However, Huber did not raise this claim below and has presented it here only through a Rule 28(j) letter.[16] If this claim were properly before us, compare Harstad v. First Am. Bank, 39 F.3d 898, 905 (8th Cir. 1994) (Rule 28(j) letter was insufficient to present a claim that was not mentioned in the party's brief), with United States v. Oliver, 397 F.3d 369, 377 n.1 (6th Cir. 2005) (Rule 28(j) letter and mention of claim at oral argument were sufficient to present the defendant's Booker claim), our review would be only for plain error because the issue was not presented to the district court. Our plain-error analysis in Booker cases is currently under development in United States v. Pirani, No. 03-2871, and all cases raising issues of plain-error are awaiting an opinion in Pirani. But, as we concluded above, this case will be remanded for a proper forfeiture judgment and resentencing because the jury's finding erroneously included approximately $1 million in premium charges

---

[15]HFGP and HFI's stance on the matter remains unclear.

[16]Huber also filed a motion for release on bond pending appeal. We denied that motion, and he filed a motion to reconsider that ruling. The motion to reconsider is still pending. Despite what Huber may think, even a constitutional violation that is plain error does not constitute a get-out-of-jail-free card. The conviction stands and the defendant must be resentenced. Thus, Huber's apparent belief that he has served all of the time that could be lawfully imposed is flawed. See 18 U.S.C. § 3143(b)(1)(B)(iv) (release is warranted if the appeal is "likely to result in a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process"). The district court on remand is not bound to sentence the defendant based solely on the facts found by the jury under the evidentiary standard applicable to guilt. There remains in place an advisory set of guidelines meant to facilitate discretionary sentencing. Thus, Huber's pending motion for reconsideration of his prior motion for release pending appeal is denied.

and subsidies the individuals never received.  So we do not reach the question whether the jury's factfinding violated Huber's constitutional rights, and this case does not need to be held pending <u>Pirani</u>.  On remand, the district court remains free to find facts and sentence Huber under the advisory guidelines scheme that was enacted as a remedy in <u>Booker</u>.  As advisory, the guidelines do not raise the <u>Apprendi</u>/<u>Booker</u> concerns that stem from mandatory sentencing criteria.

## III.    CONCLUSION

Accordingly, the judgment of the district court is affirmed except with regard to the amount of the forfeiture judgment and the sentences imposed.  We reverse the district court with regard to the forfeiture amount, and remand with directions to enter a forfeiture judgment consistent with this opinion.  We vacate the sentences the district court imposed, and remand for resentencing consistent with this opinion and the current state of the sentencing guidelines.  We also deny the pending motion to reconsider our denial of Huber's motion for release on bond pending appeal.

_____