BERZON, Circuit Judge,
dissenting in part,[1] with whom PREGERSON, PAEZ, and RAWLINSON, Circuit Judges, concur:
According to the majority, Indian tribes and their members cannot, under federal law, sue municipalities for damages for violation of rights secured by Indian treaties. The case law simply does not support the majority’s broad pronouncement. Indeed, County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (County of Oneida II), is quite directly to the contrary, permitting suits for damages under federal common law for violation of aboriginal rights reserved by treaty.
More specifically, Supreme Court precedent, as well as cases from the courts of appeals, support the conclusions that (a) both tribes and individual members of tribes may sue municipalities for damages for violations of the tribes’ treaty rights; and (b) individual tribe members may sue under 42 U.S.C. § 1983 for violations of their asserted right to take fish at the usual and accustomed times. The majority’s contrary assertions largely ignore two centuries of understandings concerning the federal protection of Indian aboriginal and treaty-based rights — in particular, the understanding that Indian treaties in large part simply preserve some pre-existing aboriginal rights in exchange for cession of a portion of Indian land. Whether the majority’s conclusions would make sense if we were developing the law of Indian rights to the use of land and water afresh — which I do not think they would — is not the question, as we are not free to reinvent established doctrine. I therefore respectfully dissent.[2]
*523 I
Without examining what pre-existing rights, if any, the Tribe reserved under the Treaty of Point No Point (“Treaty”), 12 Stat. 933 (1855),[3] the majority mistakenly dismisses all possibility that the Tribe can seek damages for violations of any such rights. This conclusion-induced by a misplaced focus on cases concerning attempts to imply causes of action from statutes or from international treaties — ignores settled precedent concerning Indian treaty-protected rights. The scope of a cause of action to enforce Indians’ aboriginal rights, including such rights reserved in treaties with the United States, cannot sensibly be resolved by invoking lines of authority developed in areas of the law lacking the long tradition of federal common law protection accorded Indian property and related rights. As the majority’s reasoning fails to appreciate the uniquely federal" nature of the land, water, and fishing claims by Indians, it is largely beside the point. There are hard issues in this case concerning the precise import of several precedents concerning Indians’ treaty-protected rights, but the majority’s simplistic approach misses them all.
I note at the outset that the majority is quite correct in recognizing — albeit in passing — that rights of action are available for equitable relief against “non-contracting” parties to Indian treaties. Ante at 512. From this starting point, however, the majority rushes to the unsupported conclusion that .a Tribe may not recover monetary damages for alleged treaty violations. In' doing so, the majority makes three major missteps: (1) conflating interpretation of this Indian Treaty with a private cause of action under non-Indian treaties and federal statutes; (2) asserting that the non-signatory status of Tacoma Public Utilities (“TPU”) and the City of Tacoma (“City”) somehow absolves those entities of responsibility here; and (3) conjuring a distinction between damages and equitable relief inconsistent with binding authority.
(1) The majority rests its constrained interpretation of the rights reserved by— and the relief available to enforce — this Treaty upon a foundation of wholly irrelevant cases. Cases construing Title VI of the Civil Rights Act (Alexander v. Sandoval, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)) or the Securities Exchange Act of 1934 (Touche Ross & Co. v. Redington, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979)) have little relevance to the interpretation of Indian treaties.[4] The Supreme Court has made clear that Indian treaties are unique, governed by different canons of construction than those that apply to statutes and other treaties. See, e.g., *524 County of Oneida II, 470 U.S. at 247-48, 105 S.Ct. 1245.
Moreover, there is no general rule preferring equitable relief over damages when implying a cause of action. Rather, were the statutory private cause of action cases pertinent, they would not support any distinction between equitable and damages relief, unless there is some indication that Congress specifically intended such a distinction. Sandoval, 532 U.S. at 286, 121 S.Ct. 1511 (“The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.”); Touche Ross & Co., 442 U.S. at 568, 99 S.Ct. 2479 (“[O]ur task is limited solely to determining whether Congress intended to create the private right of action asserted.... And as with any case involving the interpretation of a statute, our analysis must begin with the language of the statute itself.”). The majority points to no indication that Congress intended to allow suits in equity but not for damages to enforce Indian fishing rights reserved by treaties.
In short, the cases cited by the majority for the proposition that equitable but not damages relief is available with regard to rights reserved by a federal Indian treaty are of no help at all in establishing that point.
(2) In addition to its reliance on inapposite strands of case law, the majority also suggests that, even if the Treaty is self-enforcing, the Treaty cannot be enforced against the City and TPU because they are non-contracting parties.[5] No case eit *525 ed by the majority, and no case I have discovered, supports the conclusion that rights created in an Indian Treaty can only be enforced by one signatory against the other, whether for equitable relief or for damages. Instead, the eases relying on the principle that states and their agents are bound to respect treaty-created rights are legion. See, e.g., County of Oneida II, 470 U.S. at 235-36, 105 S.Ct. 1245 (approving a federal common law suit against two counties for violation of. federal aboriginal rights partly secured by treaty); Washington v. Wash. State Commercial Passenger Fishing Vessel Ass’n, 443 U.S. 658, 669-70, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (Fishing Vessel) (suit brought by the United States “on its own behalf and as trustee for seven Indian tribes” against the State of Washington to enforce treaty rights; other tribes, the state’s Fisheries and Game Departments, and one commercial fishing group were joined as parties);United States v. Washington, 157 F.3d 630, 638 (9th Cir.1998) (suit brought by numerous Indian tribes and the United States (on the tribes’ behalf) against the State of Washington to enforce treaty rights; several private parties intervened and appealed); Kimball v. Callahan, 493 F.2d 564, 565 (9th Cir.1974) (suit brought by individual Indians against officers of the State of Oregon to enforce treaty rights).
Further, as the majority recognizes, United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905), enforced Indian treaty rights even against private third-parties. So did United States v. Washington, 157 F.3d at 657.
In Winans, the United States, on behalf of certain members of the Yakima Nation, brought suit to enjoin private land owners from preventing Indians’ exercise of their off-reservation treaty rights to fish on the defendants’ private property. See 198 U.S. at 377, 25 S.Ct. 662. The Court held that the treaty between the United States and the Tribe “fixe[d] in the [now privately owned] land such easements as enable the right to be exercised.” Id. at 384, 25 S.Ct. 662. Explained Winans:
The right to resort to the fishing places in controversy was a part of larger rights possessed by the Indians ... which were not much less necessary to the existence of the Indians than the atmosphere they breathed.... [T]he treaty was not a grant of rights to the Indians, but a grant of right from them — a reservation of those not granted.... [The treaty] imposed a servitude upon every piece of land as though described therein.... The contingency of the future ownership of the lands, therefore, was foreseen and provided for — in other words, the Indians were given a right in the land — the right of crossing it to the river — the right to occupy it to the extent and for the purpose mentioned. No other conclusion would give effect to the treaty. And the right was intended to be continuing against the United States and its grantees as well as against the State and its grantees
Id. at 381-82, 25 S.Ct. 662 (emphasis added). Similarly, United States v. Washington held that, “[i]n light of Winans, Fishing Vessel, and the [Stevens] Treaties’ language and power as the supreme law of the land, the district court correctly determined that the Tribes have a right to harvest shellfish on private tidelands.” 157 F.3d at 647 (emphasis added).
(3) So, then, if the Treaty is self-enforcing and the Treaty can be enforced against *526 non-contracting parties, what is left of the majority’s assertion that the Tribe cannot seek damages for elimination of fishing rights secured by a treaty? To fill this gap, the majority asserts, repeatedly but without citation to any pertinent authority, that in a case involving a nonsignatory to the Treaty, there is a determinative distinction in enforcing these rights between an action for damages and an action for equitable relief. Ante at 513.
The entirety of the majority’s reasoning on this point seems to be that the cases upholding causes, of action for violation of Indian treaty rights but providing only equitable relief implicitly held that damages are not available. In neither Fishing Vessel nor Puyallup Tribe v. Department of Game of Washington, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968), however, were the Indians seeking damages. See Fishing Vessel, 443 U.S. at 670, 99 S.Ct. 3055 (suit “seeking an interpretation of the treaties and an injunction requiring the State to protect the Indians’ share of anadromous fish runs”); Puyallup Tribe, 391 U.S. at 394, 88 S.Ct. 1725 (“These suits were brought by respondents in the state court against the Indians for declaratory relief and for an injunction.”). That, presumably, is why the availability of damages was not discussed; courts are not in the habit of commenting on the availability of relief no one wants. So, even if this availability of damages were a question of first impression, the majority would need more than .its ipse dixit to support the damages/ equitable relief distinction central to its conclusion.
More important, the question before us emphatically is not one regarding an undecided question. There is binding authority supporting awarding monetary relief when Indians seek. to enforce their aboriginal rights, including such rights reserved in a treaty.
The first sentence of Justice Powell’s opinion in County of Oneida II explains: “These cases present the question whether three Tribes of the Oneida Indians may bring a suit for damages for the occupation and use of tribal land allegedly conveyed unlawfully in 1795.” 470 U.S. at 229, 105 S.Ct. 1245 (emphasis added). To answer this question, the Court explored at some length the historical availability of federal causes of action to enforce Indian aboriginal rights, whether secured by treaties or not, concluding that “Indians have a federal common[ ]law right to sue to enforce their aboriginal land rights.” Id. at 235, 105 S.Ct. 1245. Consequently, the Oneidas could maintain their damages action “for violation of their possessory rights based on federal common law.” Id. at 236, 105 S.Ct. 1245. Moreover, this circuit, citing County of Oneida II, has similarly affirmed the ability of an Indian tribe to bring a damages action against a public utility based upon a federal common law cause of action. See United States v. Pend Oreille Pub. Util. Dist. No. 1, 28 F.3d 1544, 1549 n. 8 (9th Cir.1994);[6] see also Mescalero Apache Tribe v. Burgett Floral Co., 503 F.2d 336, 338 (10th Cir.1974). This authority makes plain that Indian tribes may bring a damages action under federal common law to enforce their rights to use of land.
A closer examination of the nature of the Tribe’s claimed rights further reveals the majority’s fundamental misunderstanding of the very claim it summarily dismisses. Like the Oneidas,[7] the Tribe here is *527 not simply seeking to enforce rights created by the Treaty. Rather, it is claiming to enforce an aboriginal right — the right “of taking fish at usual and accustomed grounds and stations” (emphasis added)— reserved in the Treaty. See Oneida Indian Nation v. County of Oneida, 414 U.S.. 661, 677, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) (County of Oneida I) (characterizing the right claimed by the Tribe as one in which “federal law now protects, and has continuously protected from the time of the formation of the United States, possessory right to tribal lands, wholly apart from the application of state law principles which normally and separately protect a valid right of possession”); see also Winans, 198 U.S. at 381-82, 25 S.Ct. 662.
In this instance, the primary right at issue is not a claim to plenary possession of land but, instead, a claim of right to both the kind of “servitude” enforced in Winans, and to a preservation of the fish flow itself. This distinction might matter were we to consider, on the merits, the asserted reach of the rights reserved in the Treaty. But there is no conceptual distinction that would explain why the right to possession asserted in County of Oneida II, if it existed (which is what the bulk of that opinion addressed, see 470 U.S. at 233-40, 105 S.Ct. 1245) would support a cause of action for damages, while the fishing rights here asserted, if they exist (which neither the majority nor I address, see supra note 2) would not.
For these reasons, as the above-quoted language from Winans suggests, the prism through which the majority is viewing the treaty rights issue is inverted. The majority proceeds on the premise that federal enforcement of rights traceable to an Indian treaty always follows the same principles as enforcement of treaties with non-domestic nations. But Indian fishing rights, as Winans indicates, were not granted by the treaties; rather, they were reserved by the treaties and are traceable to aboriginal possessory interests, given up in part in treaties. As such, the rights thus derived are enforceable, if at all, under federal common law. See County of Oneida II, 470 U.S. at 233-36, 105 S.Ct. 1245; Nez Perce Tribe v. Idaho Power Co., 847 F.Supp. 791, 799-800 (D.Idaho 1994) (holding that the federal common law action recognized in County of Oneida I is available for damages actions based on purported tribal fishing rights, noting that “the Tribe’s right to fish is aboriginal in origin, as it was in [County of Oneida I ], and is reinforced by federal common law and the 1855 treaty.”).
Once more, so to state is not to settle the question whether the rights here asserted — to preserve fish runs from destructions — were reserved by the Treaty of Point No Point. See supra note 2. It is only to say that if the right was reserved, it is enforceable in a damages action under the federal common law. In failing to acknowledge that possibility, and, instead, resting on inappropriate analogies to treaties with foreign governments and on federal statutes having nothing to do with Indian rights, the majority reaches a conclusion in direct conflict with binding law.
*528 II
After concluding that treaties, though self-enforcing and enforceable in equity against third parties, may not be enforced in damages against a party other than the signatories, the majority goes on to hold that neither the tribe nor any individual members may bring suit under 42 U.S.C. § 1983. This conclusion, like the conclusion that there is no possible federal common law cause of action for damages based upon treaty-secured rights, reflects an inattention to nuance in the case law with regard to the rights of Indian tribes and their members.
First, the majority relies upon Inyo County v. Paiute-Shoshone Indians of the Bishop Community, 538 U.S. 701, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003), to support its conclusion that the Tribe may not, because of its status as a sovereign, bring a claim under section 1983. See ante at 514-15.
Inyo County held that a tribe may not sue under § 1983 to vindicate a right held solely because of its status as a sovereign. See Inyo County, 538 U.S. at 712, 123 S.Ct. 1887. As the majority recognizes, ante at 514-15, this narrow holding leaves open the possibility that a tribe may bring suit to vindicate rights similar to those held by private- persons. See id. at 711, 123 S.Ct. 1887 (discussing cases in which the Supreme Court had held states and foreign nations to be “persons”).
The Tribe here, unlike the tribe in Inyo County, did not base any of its § 1983 claims on rights or privileges held as a sovereign (e.g. sovereign immunity), but rather on fishing rights assertedly traceable to federal law and therefore beyond the authority of local governmental entities to impair, because of the Supremacy Clause. No special immunity premised on sovereignty as such is claimed. Instead, the underlying right asserted is one akin to a property right or a water right, commonly held by private parties, including entities such as corporations or associations. Compare id. at 714, 123 S.Ct. 1887 (“[T]he Tribe rests its case entirely on its claim that, as a sovereign, it should be accorded a special immunity that private casinos do not enjoy.”) (Stevens, J., concurring in the judgment). Inyo County therefore does not settle whether for purposes of this case, the Tribe qualifies as a “person” who may sue under § 1983 to vindicate the rights asserted in its complaint.
Hoopa Valley Tribe v. Nevins, 881 F.2d 657 (9th Cir.1989), is not to the contrary. Hoopa Valley held that “[b]ecause the right to tribal government protects the powers conferred upon the tribe, and not individual rights, it falls outside the scope of § 1983.” Id. at 662. But, as in Inyo County, the tribe in Hoopa Valley was attempting to assert a tribal government right, held solely because it was a sovereign- — namely, its freedom from state taxation.
Hoopa Valley also relies on a distinction between “power conferring provisions” and “rights conferring provisions” of federal law, holding that “power conferring provisions, such as the Supremacy Clause,” are not rights that can be vindicated under § 1983. Id. While the Supremacy Clause cannot, by itself, form the basis of a § 1983 claim, see Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 107, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), that is because the Supremacy Clause “ ‘is not a source of any federal rights.’ ” Id. (citation omitted). In Dennis v. Higgins, 498 U.S. 439, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991), however, the Supreme Court upheld a cause of action under § 1983 based on the Commerce Clause, rejecting the argument that the Commerce Clause could not be the basis of a § 1983 cause of action *529 because it “merely allocates power between the Federal and State Governments and does not confer ‘rights.’ ” Id. at 447, 111 S.Ct. 865. The Court instead held that the Commerce Clause both was a “power allocating” provision and constituted a “substantive restriction on permissible state regulation of interstate commerce.” Id. (internal quotation marks and citation omitted). Somewhat similarly, in Golden State Transit Corp., the Court held that rights created by the National Labor Relations Act can support a § 1983 action, because in that circumstance “ ‘pre-emption follows ... as a matter of substantive right.’” 493 U.S. at 110, 110 S.Ct. 444 (quoting Brown v. Hotel & Restaurant Employees and Bartenders Int’l Union Local 51, 468 U.S. 491, 503, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984)).
Here, the bases of the Tribe’s § 1983 claims are the Takings and Due Process Claúses of the federal Constitution, although the fishing rights assertedly unconstitutionally taken are traceable to the Treaty (and, ultimately, to aboriginal possession). While it was a treaty in this instance that assertedly preserved the fishing rights, in other instances similar Indian fishing and hunting rights are preserved by agreement or statute, not treaty. See Antoine v. Washington, 420 U.S. 194, 200-01, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975). The rights here at issue, then, unlike the self-governmental status central in Inyo County and Hoopa Valley Tribe, are only indirectly and marginally connected to the sovereign status of the Tribe. Private entities can also assert Takings and Due Process claims, tracing their asserted property rights to federal grants, reservations, agreements or statutes. I would therefore be inclined to hold that § 1983 is available to remedy the violations of federal law alleged by the Tribe.[8]
I need not answer that question definitively, however, as I am quite certain that a § 1983 suit can be maintained by the individual tribe members. The majority’s reasoning to the contrary runs thus: The only rights cognizable under § 1983 are individual rights; the Tribe’s right to fish is a communal right; therefore, individual members may not bring suit to enforce their fishing rights.
Before addressing this syllogism, I note that there is no support for the more general proposition that treaty-based rights cannot support a § 1983 cause of action, period. The only case that even suggests as much, United States v. Washington, 813 F.2d 1020 (9th Cir.1987) (Washington I), held only that claims resulting solely in the interpretation of treaties are not cognizable under § 1983, but that if a state “violates these now known and well-delineated rights, there would be an actual conflict between state and federal law which might give rise to a § 1983 action.” Id. at 1023 (citation omitted). So even this (rather odd) holding indicates that there are cases in which violations of rights secured in part by Indian treaties can give rise to § 1983 claims. And, in fact, we have so recognized in a later appeal in United States v. Washington, 935 F.2d 1059 (9th Cir.1991) (Washington II), where we awarded fees under 42 U.S.C. § 1988, explaining:
[T]he case before us differs from these earlier cases in a single critical respect: while previous litigation has attempted to define the treaty rights, [this proceed *530 ing] is purely an action to enforce them....
The tribes are entitled to section 1988 fees to enforce such well-defined treaty rights.
Id. at 1061 (citation omitted).
In light of Washington II, Washington I should be reconsidered rather than relied upon. Ordinarily, whether a case is cognizable under § 1983 does not turn on whether the rights are well-established or not, although qualified immunity does turn upon that consideration. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); Wong v. U.S. INS, 373 F.3d 952, 966 (9th Cir.2004). The pertinent precedent for present purposes is therefore Washington II, recognizing that Indian treaty fishing rights can give rise to a § 1983 action.
As to the majority’s individual fishing rights syllogism, this circuit has granted relief to individual tribe members suing to enforce their treaty fishing rights. See Kimball, 493 F.2d at 569-70 (granting declaratory relief to individual Indians suing to enforce their-rights-to hunt, trap, and fish within the Klamath Indian Reservation free of Oregon fish and game regular tions, pursuant to a Treaty). Kimball was later cited by the Supreme Court in support of the proposition that “[s]uch treaty rights [as the right to hunt and fish] can be asserted by Dion as an individual member of the Tribe.” United States v. Dion, 476 U.S. 734, 738 n. 4, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986). Dion cited for this proposition, in addition to Kimball, Winans and United States v. Felter, 752 F.2d 1505 (10th Cir.1985). Id.
While Kimball did not involve a suit brought under § 1983, it did reject the logic of the majority opinion: that individual tribe members may not enforce treaty fishing rights because they are communal. As Kimball explained:
Although the treaty giving exclusive fishing rights to the Quinaielts was with the Tribe, the court held [in Mason v. Sams, 5 F.2d 255 (W.D.Wash.1925) ] that the right of taking fish was a right common to the members of the Tribe and that “a right to a common is the right of an individual of the community.” [Id.].
From Mason it is clear that an individual Indian enjoys a right of user in tribal property derived from the legal or equitable property right of the Tribe of which he is a member.
590 F.2d at 773 (quoting Mason, 5 F.2d at 258) (parallel citation omitted). The hunting and fishing rights at issue in Kimball, like the fishing rights here, were nonexclusive rights. See id. at 774.[9]
Individual Indians have brought a number of § 1983 cases in the district courts to enforce their treaty rights. While I recognize these opinions do not squarely address whether the individual plaintiffs have stated a cognizable cause of action under § 1983, -they do indicate that other courts have found this marriage of treaty rights and § 1983 to be acceptable. See, e.g., Canadian St. Regis Band of Mohawk Indians ex rel. Francis v. New York, 278 F.Supp.2d 313 (N.D.N.Y.2003); Oyler v. Finney, 870 F.Supp. 1018 (D.Kan.1994), aff'd, 52 F.3d 338 (10th Cir.1995) (unpublished table decision); Mille Lacs Band of *531 Chippewa Indians v. Minnesota, 853 F.Supp. 1118 (D.Minn.1994), aff'd, 124 F.3d 904 (8th Cir.1997), aff'd, 526 U.S. 172, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999); Lac Courte Oreilles Band of Lake Superior Chippeiva Indians v. Wisconsin, 663 F.Supp. 682 (W.D.Wis.1987), appeal dismissed, 829 F.2d 601 (7th Cir.1987) (per curiam); Sohappy v. Smith, 302 F.Supp. 899 (D.Or.1969), aff'd in part, 529 F.2d 570 (9th Cir.1976) (per curiam).
I would therefore hold that the individual Indians may bring suit under § 1983 asserting violation of treaty-secured fishing rights.
* * * *
In sum, because I find no support for barring the Tribe and its members from bringing suit — either under the federal common law based on Treaty-secured rights or via § 1983 — I respectfully dissent. Once more, because the majority does not decide the question, critical though it is, I do not decide whether the Tribe or its members have alleged a right to preservation of fisheries that is protected under federal common law or § 1983.

. I dissent only from subsection A ("Treaty-Based Claims”) of Part II ("Claims Against the City of Tacoma and Tacoma Public Utilities”) of the majority opinion.

. Because the majority does not reach the questions raised in this case that logically follow a determination that these plaintiffs may bring suit for damages against these defendants — including whether the federal causes of action are barred by statutes of limitations or preserved by the Indian Claims Limitation Act (ICLA), 28 U.S.C. § 2415 note, and whether the Treaty of Point No Point ("Treaty”), 12 Stat. 933 (1855), in fact establishes the rights claimed — I do not do so either.
I do note that the most challenging question thus left open is whether the Tribe's off-reservation fishing rights give rise to a cause of action for limiting the numbers of fish that formerly inhabited the streams and rivers in which the Tribe traditionally fished, or whether, instead, the Treaty preserves only a right to take a given proportion of such fish as remain extant. This court previously addressed that important question but subsequently vacated the decision and has not since had occasion to resolve it. See United States v. Washington, 694 F.2d 1374 (9th Cir.1982), on en banc reh'g, 759 F.2d 1353, 1355 (9th Cir.1985) (failing to determine whether "the right to take fish necessarily includes the right to have those fish protected from man-made despoliation”); see also Kittitas Reclamation Dist. v. Sunnyside Valley Irrigation Dist., 763 F.2d 1032, 1033, 1035 (9th Cir.1985) (approving district court order releasing water from a water project to preserve nests of salmon eggs so as to preserve the Indian right of taking off-reservation fish "in common with citizens”); Nez Perce Tribe v. Idaho Power Co., 847 F.Supp. 791, 810 *523 (D.Idaho 1994) (holding that a Northwest Indian treaty similar to the one in this case "does not provide a guarantee that there will be no decline in the amount of fish available to take”); Conference of W. Attorneys Gen., American Indian Law Deskbook 330-33 & n. 194 (Clay Smith ed., 3d ed.2004) (noting that "[m]any commentators have advocated a treaty-based habitat protection right” and citing to the commentary).

. The Treaty of Point No Point is one of a series of treaties brokered by Territorial Governor Isaac Stevens in the mid-1800’s between the United States and various Pacific Northwest Indian tribes. These treaties are commonly referred to as "Stevens treaties.” See generally Nez Perce Tribe, 847 F.Supp. at 805-06.

. Also, a simple glance at the text of the Treaty here at issue reveals that it might still provide a cause of-action for members of the Tribe. The Treaty does speak to individuals, namely the Tribe's members, with regard to the "right of taking fish”: Although land is reserved "for the present use and occupation of the said tribes and bands,” "[t]he right of taking fish at usual and accustomed grounds and stations is further secured to said Indians,” not to the "tribes and bands.” (emphasis added).

. The majority's focus on “non-contracting parties” suggests that because the City and TPU are not signatories to the Treaty, they are somehow less responsible to respect the rights reserved by the Treaty than is 'the federal government. This suggestion would appear to call into question bedrock understandings concerning the judicial enforcement against municipal governments of the obligation to abide by federal law.
The City and TPU, as governmental entities, are bound by the rights reserved in the Treaty. Cities and local governments are, of course, subject to the Supremacy Clause. As "the constitutionality of local ordinances is analyzed in the same way as that of statewide laws” for purposes of the Supremacy Clause, Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (citation omitted), cities and local governments cannot pass ordinances or laws that " interfere with, or are contrary to,’ federal law.” Id. at 712, 105 S.Ct. 2371 (citing Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)); see Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation, 492 U.S. 408, 431, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989) (plurality opinion) ("Since the tribes' protectible interest is one arising under federal law, the Supremacy Clause requires state and local governments, including Yakima County zoning authorities, to recognize and respect that interest in the course of their activities.”); see also C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 394-95, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); Cmty. Communications Co., Inc. v. City of Boulder, Colo., 455 U.S. 40, 57, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); City of Burbank v. Lockheed Air Terminal, Inc. 411 U.S. 624, 640, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973); City of Chicago v. Atchison, Topeka & Santa Fe Ry. Co., 357 U.S. 77, 84-85, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958); Asakura v. City of Seattle, 265 U.S. 332, 343, 44 S.Ct. 515, 68 L.Ed. 1041 (1924); City of Auburn v. Qwest Corp., 260 F.3d 1160, 1175-76 (9th Cir.2001); United States v. City of Pittsburg, 661 F.2d 783, 785-86 (9th Cir.1981); Nat’l Helicopter Corp. of Am. v. City of New York, 137 F.3d 81, 92 (2d Cir.1998); Pirolo v. City of Clearwater, 711 F.2d 1006, 1010 (11th Cir.1983).
Treaties are listed among the types of law that make up "the supreme Law of the Land.” U.S. Const, art. VI, cl. 2 (Supremacy Clause) ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwith *525 standing.”). Cities and local governments therefore are bound, under the Supremacy Clause, to respect rights created by or reserved in Indian treaties.

. We agreed in Pend Oreille with the plaintiffs’ argument that “damages for trespass on Indian lands are controlled by federal law.” 28 F.3d at 1549; see also id. at 1549 n. 8 (citing County of Oneida II for support).

. That the asserted aboriginal right here is enshrined in a treaty does not separate this *527 case from the County of Oneida precedents. The Oneidas' challenge to the 1795 cession by the state of New York was predicated in part upon the "Indians' right to possession under the federal treaties'' between the United States and the Oneidas in the 1780s and 1790s. Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 664-65, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) (County of Oneida I). As is true here, "the right to possession itself is claimed to arise under federal law in the first instance. Allegedly, aboriginal title of an Indian tribe guaranteed by treaty and protected by statute has never been extinguished." Id. at 676, 94 S.Ct. 772. The majority is thus wrong in stating otherwise. Ante at 514.

. Once again, I am not addressing the merits questions whether the Treaty in fact creates or preserves the asserted right, and whether, if so, impairing that right violates § 1983. The only question addressed by the majority, and therefore the only one I address, is whether the Tribe is entitled to a judicial answer to those questions.

. Settler v. Lameer, 507 F.2d 231 (9th Cir.1974), and Whitefoot v. United States, 155 Ct.Cl. 127, 293 F.2d 658 (1961); upon which the majority rely, were decided before both Kimball and Dion. Also, they concern the question whether the individual fishing rights are subject to tribal regulation, not whether individual rights consistent with tribal regulation may be asserted by individual Indians. Settler, 507 F.2d at 232; Whitefoot, 293 F.2d at 661, 663. As such, they are not informative with respect to the problem before us.